SCHEXNEIDER, Appellant, v. GENERAL AMERICAN TANK CAR CORP.

(July 5, 1926.  Opinion and Decree.)
(July 19, 1926.  Rehearing Refused.)
(Oct. 5, 1926.  Writ of Certiorari and Review Denied by Supreme Court.)

*(Syllabus by the Court.)*

1. Louisiana Digest—Master and Servant —Par. 158.

A water boy, accidentally shot and killed by a fellow employee, a night watch-man, due to the mutual indulgence in horse play in which the night watch-man brandished his revolver in a mocking spirit of hostility, may be said to have been injured and killed in the course of and his injury to have arisen out of his employment.

Appeal from Civil District Court, Division "D".  Hon. Porter Parker, Judge.

Action by Mrs. Regina Schexneider, widow of Anthony Petrolia, against General American Tank Car Corporation, Ltd., of Louisiana.

There was judgment for defendant and plaintiff appealed.

Judgment reversed.

Solomon S. Goldman, of New Orleans, attorney for plaintiff, appellant.

Frank T. Doyle, J. C. Unsworth, of New Orleans, attorneys for defendant, appellee.

WESTERFIELD, J.    Plaintiff brings this suit on behalf of herself and her minor children for compensation for the death of her husband, Anthony Petrolia, who it is alleged was killed under cir-cumstances involving defendant's liability under the compensation act.

Defendant denied liability upon the ground that the injury which resulted in the death of Petrolia did not arise out of and was not received in the course of his employment.  From a judgment for defendant, plaintiff has appealed.

Petrolia at the time of his death was employed by the defendant as a water boy and was killed by Oscar St. Amant, also employed by defendant in the capacity of night watchman.

The case was tried upon a statement signed by three eye witnesses and a state-ment of the night watchman, St. Amant.

The statement of the three witnesses is as follows:

"On June 17, 1925, about twenty minutes to seven, Benoit Vicknair and Adam Las-seigne, who also live at Reserve, in my company, went to the General American Tank Car Company to get a job.  We had all worked there before and had been laid off when they cut the force.

"About 7:00 o'clock we were on the bridge with another fellow, Joe Rodriques, in front of the office.  He saw the watch-man punch the clock and at the same time saw Tony Petrolia come in toward or about one hundred and fifty or two hun-dred feet away.  He was walking at a very moderate speed with a bucket in his hand.  Tony is water boy and he and the watchman use to walk together to where he got his water when the watchman was going home.  When the watchman was coming toward the bridge Tony hollered to him to wait and that if he didn't he would break his bucket over his head.  The watchman told him that he had something to stop him with, but it was not until he got to the bridge that the watchman pulled out his gun from his little bag.  He pointed it at Tony and the gun went off. I (we) do not believe the watchman (St. Amant) went to shoot him because they were always playing with each other and all the remarks were made with smiles

and kidding each other. I (we) cannot state the exact time this happened but I (we) do know that all the men had gone to work and they never go to work before 7:00 o'clock sharp. It must have been about five minutes after St. Amant (the watchman) punched the clock that he happened to shoot this man Tony. When Tony was shot he fell backwards and afterwards was put in a little Ford truck and taken to a doctor."

St. Amant's statement differs, only slightly:

"My name is Oscar St. Amant. I am 62 years old and reside at Good Hope, Louisiana. I receive my mail at Sellers, La. I have been working for the General American Tank Car Company since the 18th of last March, as night watchman. I receive one hundred and eight dollars a month. I work from 5 p. m. to 7 a. m. I carried a gun.

"On June 17th at 7:00 o'clock a. m., or very near this hour, I was about to leave the plant of the above company after punching the clock. Every morning since Tony Petrolia was water carrier, I use to wait for him. He went over to the railroad to get a bucket of water. This was on my way home and I liked to have him walk down with me for company. This was every day when he went for his first bucket of water.

"I waited on the bridge for him to come up when he had his water bucket. He must have punched the clock before coming up with his bucket. When he got near me, I hollered to him, 'come on Gee Gee'. He, then, in a playing way stooped down to pick up a piece of gravel at the same time saying, 'don't call me that'. I then told him 'look what I got', and showed him my pistol, holding it up. Just then he told me 'I eat that', and how it happened or what, I do not know, but the gun accidentally went off. The bullet hit him in the neck and knocked him down backwards. There were four men sitting on the railing on this bridge at that time and saw it all."

It is obvious that Petrolia was accidentally shot by St. Amant, who, in a mocking spirit of hostility, pointed his loaded revolver at him. What was intended as humor proved to be most tragic. Another example of the fatal consequence of the careless handling of lethal weapons.

It is argued "that the foregoing statements show conclusively that the shooting of Tony Petrolia was the direct result of the horseplay and skylarking that took place between himself and the watchman and with which Petrolia's employment had no connection whatever. The statements show that Petrolia and the watchman were very friendly and that it was the custom of the watchman, after his night's work was over, to wait for Petrolia and to walk down the railroad track to his home with Petrolia. It cannot be said that Petrolia's employment subjected him to the hazard of being shot by the watchman when there was no reason for the two of them ever being on the assured's plant at the same time, because Petrolia's employment begin at 7:00 o'clock in the morning, while the watchman's employment terminated at exactly the same hour and it was only because of their mutual friendship and liking for each other and to satisfy their own whim that they were ever thrown into contact with each other at the defendant's plant. As a matter of fact, at the time of the shooting, the watchman had already punched the clock and checked off from work."

There was no necessity for Petrolia to have anything to do with the night watchman. Indeed, there is seldom any necessity for one employee to associate with another and there is never any necessity for friendship or enmity between employees. No necessity, yet, as long as human nature is unchanged such things are to be expected. For man is a gregarious animal, He is ever seeking companionship. His every joy is sweetened and every sorrow

softened by association with others. Death, alone, of all his experiences, admits of no mitigation because he must take that journey alone.

It was but natural for Petrolia to seek companionship, where he found it most congenial, among his fellow workmen. He chose the night watchman and a friendship developed between them.

· At the time of his injury he was indulging a privilege of that friendship in a manner not unusual in his station of life. A threat of breaking a bucket over a friend's head in the event of his failure to wait for you is not customary in certain circles, as an invitation or request for the friend's company, but it was understood by St. Amant, who in a perfectly friendly way drew his revolver and threatened to "stop" Petrolia. Perolia's rejoinder "I eat that" would have closed the incident and the two friends would have had their customary walk together but for the unexpected discharge of the fatal shot. The incident was one of friendly badinage tomfoolery or horseplay.

Counsel for defendant has cited a number of cases from other jurisdictions. We select several of these cases with counsel's appreciation thereof as they appear in his brief.

In the case of Geceiviec vs. Travelers Ins. Co., ·3 Mass. Workmen's Comp. Cas., p. 183, two employees were fooling and pushing each other and one of them, in trying to steady himself, put his hand under the knife blade of a chopping machine which was operating, with the result that three of his fingers were cut off. It was held by the Arbitration Committee, and affirmed by the Accident Commission, that the injury was the result of fooling or skylarking and did not arise out of the employment.

In the case of U. S. F. & G. vs. Cassell, (1922), 243 S. W. 504, the defendant operated a theatre and, for the purpose of lending color to a play, kept two pistols which were discharged from time to time when required in the play. A supervisor of the employees snapped one of these pistols on different persons without injury. He then snapped it at claimant and the pistol exploded, injuring the claimant, who had taken no part in the fooling or horseplay. The Court of Appeal reversed the judgment below and held that the accident did not arise out of the employment, despite the fact that the injured party himself had taken no part whatever in the skylarking or horseplay.

In the case of Frost vs. Franklin Mfg. Co., 198 N. Y. S. (1923), 521, the claimant was a toolkeeper. While he was writing out an order for some materials, another workman came up and asked for wire. Claimant handed some wire to the workman and, at the same time, pulled the peak of the workman's cap down over his eyes. When the workman attempted to remove the cap from his eyes, a file which he held in his hand came out of its handle and struck the claimant in the right eye, destroying same. The court held that the accident only followed as a continuance of the primary act of the claimant and that it was not an accidental injury arising out of the employment.

We are referred to no decision of our Supreme Court directly in point and we know of none. However, it has been held that a locomotive engineer shot by a person unknown while firing his engine at night in a lonely spot in the woods was injured in the course of his employment. Dyer vs. Rapides Lumber Co., 154 La. 1091, 98 South. 677; that a truck employee struck in anger on the head· by a fellow employee could recover under the compen-

sation act. Ferguson vs. McFarlane Gravel Co., 156 La. 871, 101 South. 248.

This court held (Conway vs. Marine Oil Company, Ltd., No. 10,388 Orl. App.), that an employee of a gasoline and oil filling station shot by the accidental discharge of a revolver in the hands of a fellow employee was not injured in the course of his employment, but we said in that case:

"In the case at bar Conway was shot in the course of his employment by a careless fellow servant. There is no casual relation between the source of his injury and the character of his employment. Conway's duties did not expose him to the danger of accidental shooting, nor is there any allegation that the revolver from which the shot was fired belonged to Conway's employer and was kept on the premises for protection and possible use in defense of defendant's property * * *. It was no more to be expected that Conway would be shot while at work in the manner alleged and by a careless fellow servant, than that he should be similarly injured at home by a member of his family."

In the case now before us Petrolia was shot by the night watchman of defendant. The revolver, from which the shot was accidentally discharged was a part of the watchman's equipment and essential to his employment as a means of protecting his employer's property. This case is very different from the Conway case and differs also from the cases cited from other jurisdictions where the injury resulted entirely from the pranks of employees without reference to any instrumentality of the employer's business. As was observed in Stark vs. State Industrial Accident Commission, 204 Pac. 151:

"In several of the cases it is indicated that where the injuries are caused on account of the general surroundings of the place in which the injured employee is laboring and particularly where the instrument of appliance which is a part of the plant and used in the prosecution of the work is what caused the injury, or is a concurring cause, the accident may be said to arise out of and in the course of the employment."

In the cited case Stark and a fellow workman named Cooper were playing with an air hose and struggling for possession of it, in order to turn it on each other. Stark, getting possession of the hose, turned and ran. In doing so he stumbled over a block and in some way got the hose in such position that the air was blown into his rectum, causing peritonitis and death.

The court in that case said:

"The injuries in question were caused by an industrial accident. It was a peril of the service, under the usual condition there prevailing the employees were more or less subject to such peril. It was an unexpected accident, but nevertheless may reasonably be said to have arisen out of and in the course of the employment. It was an incident of such employment by reason of the appliance used in the work, and the custom which prevailed of the employees, without the infraction of any enforced rule of the establishment, diverting the use of the air hose to sport. The play which had been going on between Stark and Cooper was entirely mutual. The question as to who started the sport can become material only for the purpose of fixing the fault, and as we have already pointed out, fault of the injured employee under certain conditions, such as prevailed in this case, does not constitute a reason for not allowing compensation. This is not an action against the employer" (meaning compensation in that state is payable out of a state fund).

"It may be said that two things concurred to cause the injury: first, stumbling over the skid block; second, coming in contact with the air from the air compressor. Both the skid block and the air hose were a part of the surrounding under which he had labored for more than a year. It is not necessary to say that the employer was at fault, or that Cooper was at fault, or that Stark was free from fault.

It might be remarked parenthetically that it is not to be supposed that a crew of men could be obtained unless some of them during working hours would play practical jokes on their fellow workmen, especially if such men were red blooded Americans."

Our conclusions are that the injury which resulted in the death of Petrolia were received in the course of and arose out of his employment and that consequently his dependents should recover.

For the reasons assigned the judgment appealed from is reversed and it is now ordered that there be judgment in favor of plaintiff herein, Mrs. Regina Schexneider, widow of Anthony Petrolia, for the common benefit of herself and her children Anthony, Jr., Junius Sam, Regina and Madeline Petrolia and against the defendant, the General American Tank Car Corporation, Ltd., of Louisiana, for compensation under the terms of the Workmen's Compensation law for three hundred weeks beginning June 17, 1925, at the rate of ten and 53-100 ($10.53) per week with legal interest upon each installment from its due date and all costs.