No. 880

First Circuit

——

## CATHERIN v. COMMERCIAL CASUALTY INS. CO.

——

(December 8, 1931. Opinion and Decree.)
(February 8, 1932. Rehearing Refused.)
(February 29, 1932. Writ of Certiorari and Review Refused by Supreme Court.)

——

Shelby Taylor and A. B. Parker, of Baton Rouge, attorneys for plaintiff, appellee.

Milner & Porteous and F. Carter Johnson, Jr., of New Orleans, attorneys for defendant, appellant.

ELLIOTT, J. Herman Catherin, an employee of Baton Rouge Poster Advertising Company, while engaged in his work of posting advertising signs, was shot in his right eye as a result of the accidental firing of an old shotgun barrel in the hands of Earl Ramsey, his assistant, which said Ramsey, in performing services arising out of and incidental to his employment in the course of his employer's business, had picked up in cleaning away the rubbish around the signboard on which they were posting signs.

Alleging the loss of his eye, and that Baton Rouge Poster Advertising Company had at the time, under Act 20 of 1914, sec. 23 (amended by Act 85 of 1926), employer's liability insurance with Commercial Casualty Insurance Company, and that said contract of insurance constituted a direct obligation in his favor, the said Catherin brought suit against the insurance company claiming of them compensation on said account at the rate of $9.75 per week for a period of 100 weeks, less $107.25 paid previous to the institution of the suit.

An exception of no cause of action filed by defendant, not acted on in the lower court, is not before us on appeal.

Defendant admits having paid plaintiff compensation to the extent of $107.25, but alleges that it was done through error of fact and of law. It denies liability and avers that the claim does not arise out of and in the course of plaintiff's employment; that there was no causal connection between the employment and the injury.

There was judgment in favor of the plaintiff, and the defendant has appealed.

The evidence shows that the work of Herman Catherin and Earl Ramsey consisted in pasting posters for advertising purposes on signboards erected at certain places.

The performance of their work required them to take off the old advertisements, paste new ones on the boards, and clean away the rubbish and trash around the place where the signboards stand.

In this instance the plaintiff was getting ready to put on a new advertisement, and Earl Ramsey at the same time was engaged in cleaning away the rubbish near the board, and to that end was picking it up. In so doing Ramsey picked up the barrel of an old single barrel shotgun found lying in front of the board, which in some way not satisfactorily explained was fired, and the shot from it struck plaintiff in the right eye, putting out his eye.

The serious question is whether there existed a causal connection between the injury and the circumstances under which the gun barrel was fired.

Defendant queries thus: "Where a gun is found while performing a service for the master, and one employee deliberately points it at another and the cartridge is discharged so that an employee loses an eye, does the accident arise out of and in the course of his employment?"

Defendant is mistaken in putting the question as if Earl Ramsey had deliberately pointed the gun at the plaintiff. It does not appear to have been done purposely.

Defendant sent an agent to the plaintiff soon after the accident happened and procured from him a written statement in which there appears the following language:

"Earl Ramsey picked the gun up and turned it to the ground and snapped it, but it did not go off. Then he pointed the gun towards me and as he did, it went off and the shots hit me on the right side of the face. I did not know whether the gun was cocked or not, or whether he pulled the trigger again to make it go off."

This statement implies that the gun was purposely pointed toward the plaintiff, but the plaintiff and Earl Ramsey, testifying on the trial, do not say that the gun was snapped, and, failing to go off, was then pointed toward the plaintiff. The plaintiff says:

"Q. When he called your attention to the fact that he had the gun in his hand and said he found an old rusty shot gun, where did he have it pointed?

"A. He had it in his hand.

"Q. Was he looking at it, examining it?

"A. No, sir, he was not examining it, he was just turning it over in his hands.

"Q. Did he have anything else in his hands?

"A. Yes, sir, paper. Old bill poster paper."

Questioned further, he said that the gun barrel had no stock, handle, nor trigger on it. But later he said, as for the gun having no trigger, he did not know that of his own knowledge.

Earl Ramsey, testifying on the subject, says that the butt of the gun had rotted off:

"Q. Did it have a trigger on it?

"A. No, sir. It was a hammerless gun; it had a thing on the bottom but it did not have any hammer on it. I picked up the gun and showed it to Catherin. He said, yes, I see it. Just as I went to throw the gun away it went off.

"Q. In your hands?

"A. Yes, in my hands.

"Q. How did it happen that the gun went off?

"A. All I know is that I threw the gun away, like that (indicating). Just when I took the gun to throw it away, there was a screw hanging out of the gun where the stock was nailed on it.

"Q. You made a simple gesture or movement of your hand that contained the gun, didn't you?

"A. Throwed it away, yes.

"Q. And as you moved your hand or made the gesture the gun went off?

"A. Yes.

"Q. I want you to be truthful about this—after the gun went off did you not still have the gun in your hands?

"A. After the gun went off, the gun fell out of my hand.

"Q. The gun was in your hand when it went off?

"A. Yes, when she went off it fell out of my hand.

"Q. When it went off you threw it away?

"A. No, it jumped out of my hand.

"Q. It went off when it was in your hand?

"A. Yes."

According to the testimony, Ramsey picked up the gun barrel and had it in his hands with some old poster paper, but it was not by him intentionally pointed at the plaintiff; yet it was of course pointing at plaintiff's face, otherwise the shot would not have struck him in the eye.

The Act 20 of 1914, sec. 38 (amended by Act 38 of 1918), says that an accident shall, unless a different meaning is clearly indicated by the context, "be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault."

This gun barrel was not exposed to fire nor to an electric spark. It did not spontaneously fire as a result of having been picked up and held in the hand. Ramsey must have done something to bring it about, but just how it came to fire, the evidence does not enable us to say.

Defendant cites us to Conaway v. Marine Oil Co., 162 La. 147, 110 So. 181. In that case the court said:

"While Conaway was engaged in supplying the tires of an automobile with air, a pistol in the hands of one of defendant's employees was accidentally discharged, the bullet therefrom striking and killing Conaway.".

It does not appear from the opinion that the employee whose pistol was discharged was handling the pistol in the performance of his duty as employee and in performing service arising out of and incidental to his employment in the course of his employer's business.

In the present case this does appear; hence a difference exists between the situation in the present case and the case cited.

Ramsey, in picking up the gun barrel lying near and in front of the board and in having it in his hands for the purpose of casting it away so that the space near the board might be clear of rubbish, was performing service arising out of and incidental to his employment and in the course of his employer's business. The employment of the plaintiff in the same work in which Ramsey was engaged, caused him to be near the board and within range of the gun and the shot discharged from it.

The fact that Ramsey was careless in handling the rubbish picked up by him is not a matter which we can take into account. Therefore there seemingly appears a causal relation between the picking up of the gun barrel, having it in hand for the purpose of casting it away, which was the source of the injury, and the injury to the plaintiff, as the result of his service in the same employment.

The situation in the present case appears to us to be on a parity with that which existed in Schexneider v. General American Tank Corporation, 5 La. App. 84. In that case St. Amant, whose pistol fire killed a fellow employee, in explaining how it happened, testified in part as follows: "* * * And how it happened or what, I do not know, but the gun accidentally went off." The employee whose pistol killed the other employee was a watchman, whose work required him to have a pistol at the time and place, and the service of the other party who was killed required him to be there at that time.

In Myers v. La. Ry. & Navigation Co., 140 La. 937, 74 So. 256, 257, we copy from the syllabus:

"The test to determine whether injuries to a workman arise out of his employment is not whether the cause of the injury, that is, the agency producing it, was something peculiar to the time of employment, but whether the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment."

The facts of the present case meet the requirements of this test.

In Dyer v. Rapides Lumber Co., 154 La. 1091, 98 So. 677, the court said:

"Where a workman is exposed to some risk manifestly necessitated by his employment, he is entitled to his compensation, unless it be also manifest that he would at the time of the occurrence have been equally exposed to the same risk outside of his employment."

The facts of the present case also meet this test.

The cases Ferguson v. Cady-McFarland Gravel Co., 156 La. 871, 101 So. 248; Byas v. Hotel Bentley, 157 La. 1030, 103 So. 303, and Brown v. Vacuum Oil Co., 171 La. 707, 132 So. 117, support liability in principle. The causal relation between the source of

injury and the employment of the party injured, in Gasca v. Pipe Line Co., 2 La. App. 483, and Lebourgeois v. Lyon Lumber Co., 6 La. App. 216, was not greater than seems to exist in the present instance.

The judgment appealed from is in our opinion correct.

Judgment affirmed, defendant and appellant to pay the costs in both courts.