**KING v. AMERICAN TANK & EQUIPMENT CORPORATION.**

No. 4412.

Court of Appeal of Louisiana. Second. Circuit.

Nov. 10, 1932.

Thatcher, Browne, Porteous & Myers, of Shreveport, for appellant.

Robert Roberts, Jr., of Shreveport, for appellee.

**DREW, J.**

Plaintiff sued for compensation at the rate of $20 per week for a period of four hundred weeks, alleging total disability caused by an accident while he was in the employ of defendant.

Defendant excepted to the citation and pleaded to the jurisdiction of the court. Both the exception and plea to the jurisdiction were overruled by the lower court. It then answered, admitting the employment and the daily wage, as alleged by plaintiff; admitting the accident, but denying that plaintiff was totally disabled; and averring that if plaintiff is entitled to any judgment, it is only for partial permanent disability of a leg to the extent of 50 per cent. It further averred that it had paid doctor's and medical bills for plaintiff to the amount of over $700, and had paid compensation to plaintiff in the amount of $1,016.32.

The lower court rendered judgment for plaintiff for the sum of $17.55 per week, during the period of disability, not to exceed four hundred weeks, less a credit of $1,016.32. From which judgment defendant has appealed. Plaintiff has answered the appeal pray-

ing that the judgment be increased from $17.55 to $20 per week.

There is no dispute as to the facts, except as to the extent of injury of plaintiff. The facts are as follows: On March 9, 1930, defendant, a nonresident corporation, was engaged, in the state of Louisiana, in the business of constructing and erecting steel tanks, oil field and oil well machinery, and in loading and unloading machinery and steel plates into and from freight cars; and that on March 9, 1930, plaintiff, a resident of Arkansas, was employed by defendant, at Sarepta, La., as a laborer at a daily wage of $4.50, to assist in unloading a car of steel strips at Sarepta, to be used for the construction of tank cars. While so engaged, on March 9, 1930, the same day he was employed, a number of steel strips, 5 feet by 8 feet in dimension, fell upon plaintiff, severely injuring him.

Defendant paid to plaintiff compensation at the rate of $17.31 per week, amounting in all to $1,016.32. The last payment was made on May 1, 1931. Defendant also paid doctor's and medical bills in an amount in excess of $700.

On September 26, 1931, the present suit was filed. On July 1, 1931, the defendant corporation withdrew from doing business in the state of Louisiana, and at that time gave formal notice to such effect to the secretary of the state of Louisiana, and at the same time the power of attorney designating G. F. Ingersoll as agent for service of process in Louisiana was canceled and rescinded. The said cancellation of the power of attorney and withdrawal from Louisiana on the part of said corporation was recognized by the secretary of the state of Louisiana on July 25, 1931, to take effect as of that date. Prior to said time, G. F. Ingersoll, then and now a resident of Caddo parish, La., was the duly designated agent of the defendant corporation in Louisiana for service of process, and defendant corporation has appointed no person in Louisiana as its agent for service of process since July 25, 1931.

When service of citation and petition was made on G. F. Ingersoll, on October 6, 1931, he protested against such service being made on him by stating at the time that he was no longer the designated agent for service of process in Louisiana, of the said defendant corporation, and that said corporation had already withdrawn from doing business in the states of Arkansas and Texas prior to the time of withdrawal from Louisiana.

The exception and plea to the jurisdiction are presented together in this court and will be treated in the same manner by us. The exception to the citation is based upon the theory that G. F. Ingersoll was not the authorized agent of defendant for service of process at the time of the service. The plea to the jurisdiction is based on the theory that defendant is a nonresident corporation, domiciled in the state of Oklahoma, and had formally withdrawn from doing business in the state of Louisiana on July 25, 1931, and that after that date a nonresident of the state of Louisiana could not legally sue defendant in the courts of the state of Louisiana, and for the further reason, in the alternative, that if the court should hold that Act No. 184 of 1924 gives jurisdiction, that the act is violative of section 1 of the Fourteenth Amendment to the Constitution of the United States, in that its effect would be to take the property of defendant without due process of law.

Plaintiff's contention, which was sustained by the lower court, is that Ingersoll's authority as agent for service of process is irrevocable as to liabilities arising out of business transacted in this state, that is, arising out of a contract made in the state for work to be performed and performed within the state.

Defendant contends that the agent's authority is revocable in so far as it concerns suits by nonresidents of the state, even though the liability arose out of business transacted in this state, that is, even though the liability arose out of the contract made in the state of Louisiana for labor to be performed or that was performed in this state.

Section 1 of Act No. 184 of 1924 provides that foreign corporations doing business in this state shall appoint a resident of this state as an agent upon whom service of process shall be made. Section 2 of this act provides as follows:

"The appointment of the agent or agents or officer upon whom service of process may be made shall be contained in a written power of attorney accompanied by a duly certified copy of the resolution of the Board of Directors of said corporation consenting and agreeing on the part of the said corporation that any lawful process against the same which is served upon the said agent or officer shall be a valid service upon said corporation and that the authority shall continue in force and be maintained as long as any liability remains outstanding against said corporation growing out of or connected with the business done by said corporation in this State."

The language of the act is plain and needs no interpretation. As long as any outstanding liability remains against the corporation, service upon the agent appointed by said corporation upon whom service of process is to be made, is a legal and valid service, and as long as that liability remains outstanding a revocation of the agent's authority is without avail. There is nothing in the act to limit it to citizens of this state only. The only limitation is that the liability must have grown out of or connected with the business done by said corporation in this state.

The attorneys for both appellant and appellee contend that the question to be determined here is res novo in this state, and the only two cases cited from our courts are Gouner v. Missouri Valley Bridge & Iron Company, 123 La. 964, 49 So. 657, and National Park Bank v. Concordia Land & Timber Company, 154 La. 31, 97 So. 272, 276. The Gouner Case was decided May 24, 1909, and construes Act No. 54 of 1904. The National Park Bank Case was decided July 17, 1922, and construes Act No. 267 of 1914 and Act No. 179 of 1918. The court in this last-cited case said:

"The law nowhere requires such corporations to maintain agents for such purpose after they have withdrawn permanently, except probably insurance companies, and then only for service of process as to causes of action which arose while such companies were transacting business in the state."

Act No. 54 of 1904, Act No. 194 of 1912, and Act No. 243 of 1912 all deal with appointment of agents by foreign corporations, but they do not require foreign corporations to maintain an agent in the state after they have permanently left the state. Act No. 184 of 1924, with which we are now dealing, seems to be the first act containing the provision that as long as any liability remains outstanding against said corporation, growing out of or connected with the business done by said corporation in this state, the said corporation must maintain an agent for service of process.

Under the authority of the two Louisiana decisions above cited, the rule in Louisiana, prior to the passage of Act No. 184 of 1924, was, where a foreign corporation had ceased to do business within Louisiana, the revocation of the authority of its agent designated for the service of process was effectual, although the liability of the corporation was incurred while it was doing business in the state. This rule applied to resident citizens of the state of Louisiana, as well as to nonresidents. No distinction was made. This was the rule only in Louisiana and one or two other states. The rule in the great majority of states was that a foreign corporation once qualified to do business in a state by appointing a qualified agent, upon withdrawing from the state and cancelling the authority of its agent, was still subject to the jurisdiction of the local court for liability incurred while doing business in the state. Frazier v. Steel & Tube Co. of America, 101 W. Va. 327, 132 S. E. 723, 45 A. L. R. 1442, 1447, 1456.

By the clear language of Act No. 184 of 1924, Louisiana joined the ranks of the majority of the states of the Union in the rule that the authority of the agent appointed for service of process shall continue in force and be maintained as long as any liability remains outstanding against the corporation, growing out of or connected with the business done by said corporation in this state, and thereby abrogated the rule in the state prior to the passage of this Act.

Appellant concedes that Act No. 184 of 1924 does give to a citizen of Louisiana the right to sue a corporation within this state, even if the corporation has withdrawn from the state, where liability remains outstanding against the said corporation at the time of the withdrawal, growing out of business done by the corporation in this state, but that the right is not given to nonresidents, even though the contract for service was made within the state and the services performed in the state.

Counsel for appellant has cited numerous cases in support of his contention and relies principally upon Hunter v. Mutual Reserve Life Ins. Co., 184 N. Y. 136, 76 N. E. 1072, 30 L. R. A. (N. S.) 677, 6 Ann. Cas. 291, affirmed by the United States Supreme Court 218 U. S. 573, 31 S. Ct. 127, 131, 54 L. Ed. 1155, 30 L. R. A. (N. S.) 686, and Old Wayne Mutual Life Association v. McDonough, 204 U. S. 8, 27 S. Ct. 236, 240, 51 L. Ed. 345. Our appreciation of these two cases is that they do not bear out the contention of appellant, but, to the contrary, hold that it is not the citizenship of plaintiff that governs, but the place where the business is transacted. In the Hunter Case, the court quoted from Moore v. Mutual Reserve Fund Life Association, 129 N. C. 31, 39 S. E. 637, as follows:

"It is conceded that, as a general rule, a principal has the right to revoke a power of attorney at any time, whether it is in terms irrevocable or not. But to this general rule there are well-established exceptions, as to where it is coupled with an interest, or where it is contractual in its nature, given for a consideration and for the protection of someone or some interest. In our opinion this power falls under this exception to the general rule. It was contractual in its nature, was given upon consideration that defendant should have the right to carry on its business in this state, and for the protection of those who should deal with the defendant."

Then continuing, in its own words, said:

"Manifestly, this means who should deal with the defendant in the state."

The court further said:

"It could not revoke it as to any 'interest or right founded or created upon the faith thereof,' and which 'required its perpetuation and continuance.'"

Likewise, in Old Wayne Mutual Life Association Case, the court said:

"But even if it be assumed that the insurance company was engaged in some business in Pennsylvania at the time the contract * * * was made, it cannot be held that the company agreed that service of process upon the insurance commissioner of that commonwealth would alone be sufficient to bring it into court in respect of all business transacted

by it, no matter where, with, or for the benefit of, citizens of Pennsylvania. * * *

"Conceding, then, that by going into Pennsylvania, without first complying with its statute, the defendant association may be held to have assented to the service upon the insurance commissioner of process in a suit brought against it there in respect of business transacted by it in that commonwealth, such assent cannot properly be implied where it affirmatively appears, as it does here, that the business was not transacted in Pennsylvania. Indeed, the Pennsylvania statute, upon its face, is only directed against insurance companies who do business in that commonwealth,—'in this state.' While the highest considerations of public policy demand that an insurance corporation, entering a state in defiance of a statute which lawfully prescribes the terms upon which it may exert its powers there, should be held to have assented to such terms as to business there transacted by it, it would be going very far to imply, and we do not imply, such assent as to business transacted in another state, although citizens of the former state may be interested in such business."

, Chipman v. Jeffrey Co., 251 U. S. 373, 40 S. Ct. 172, 64 L. Ed. 314, holds to the same ruling, and Morris & Co. v. Skandinavia Insurance Company, 279 U. S. 405, 49 S. Ct. 360, 361, 73 L. Ed. 762, involved the interpretation of a statute of Mississippi very similar to Act No. 184 of 1924, of Louisiana. In this case, plaintiff was a Louisiana corporation, and the defendant, a Denmark corporation. The suit was filed in Mississippi. The court said: .

"The policy sued on was issued and the loss occurred in South America. The importation of such controversies would not serve any interest of Mississippi. The purpose of state statutes requiring the appointment by foreign corporations of agents upon whom process may be served, is primarily to subject them to the jurisdiction of local courts in controversies growing out of transactions within the state." Citing Old Wayne Mutual Life Ass'n v. McDonough, supra; Simon v. So. R. Co., 236 U. S. 115, 35 S. Ct. 255, 59 L. Ed. 492; Robert Mitchell Furniture Co. v. Selden Brick Const. Co., 257 U. S. 213, 42 S. Ct. 84, 66 L. Ed. 201; L. & N. Ry. Co. v. Chatters, 279 U. S. 320, 49 S. Ct. 329, 73 L. Ed. 711.

The court further said:

"The language of the appointment and of the statute under which it was made plainly implies that the scope of the agency is intended to be so limited. By the terms of both, the authority continues only so long as any liability of the company remains outstanding in Mississippi."

The statute interpreted in the last-cited case is almost identical with the statute before us, and the language used by the Supreme Court of the United States can well be adopted by us. It is clear from the above decisions that whether plaintiff is a citizen of the state or not has no bearing on the case. It is the place where the contract was entered into and performance done that gives jurisdiction. In this case the place of the contract of employment was Sarepta, La., the work to be done under the contract was at Sarepta, La., and, under the provisions of Act No. 184 of 1924, the courts of this state have jurisdiction.

Western Grocer Co. v. N. Y. Oversea Co. (D. C.) 296 F. 269, 270, was a suit by an Iowa corporation against a New York corporation in a California court, for damages for breach of contract, entered into and to be performed in California. At the time of the contract, 'defendant was qualified to do business in California and had appointed a local resident for service. At the time of the suit, the agent appointed had been withdrawn and service was made on the secretary of state, in accordance with the provisions of the California statute. In sustaining the validity of the service, the court said:

"It is at once apparent that, to permit a corporation to accept the benefits of this statute, and, after it had entered into contracts, to evade jurisdiction by withdrawing its agent, would be in the highest degree inequitable and unjust. * * *

"Having accepted those conditions, to use the language of Davis v. Kansas & T. Coal Co. (C. C.) 129 F. 149, 'that section of the statute became in the nature of a contract between the company and the state.' In my opinion, it becomes more than that. I think it becomes a part of every contract which the corporation may make within the state, and which is to be performed within the state. In other words, I believe that, when defendant complied with the provisions of the California statute, those provisions are to be read into all of its contracts here, and one of those provisions is that, in the event of its withdrawal from the state, service of process can be made upon the officer provided by statute."

United Oil & Natural Gas Products Corporation v. United Carbon Co., 171 La. 374, 131 So. 52, is a case dealing with the interpretation of Act No. 184 of 1924. In this case the defendant corporation had not withdrawn from doing business in the state, and both plaintiff and defendant were foreign corporations authorized to do business in the state of Louisiana. The contract sued upon was entered into in New York and involved lands located in Louisiana used by defendant in its business in Louisiana. A plea to the jurisdiction was sustained by the lower court, and the Supreme Court, in overruling said plea, has made it clear that the thing that governs, as to jurisdiction under Act No. 184 of 1924, is not citizenship of Louisiana, but the place

where the business is transacted, and whether or not the liability, if it exists, arose from a transaction growing out of or connected with the business done by the defendant corporation in this state; and in State ex rel. Watkins v. North Amer. Land & Timber Co., Ltd., 106 La. 621, 31 So. 172, 175, 87 Am. St. Rep. 309, the court, in interpreting Act No. 149 of 1890, which prescribed the conditions on which foreign corporations might do business in this state and how service and citation might be had on them, if failing to comply with the statute, said:

"The plea to jurisdiction is based on the proposition that the constitutional and statutory law which has been quoted was intended to confer upon the state courts jurisdiction only in suits brought by citizens of Louisiana against foreign corporations engaged in business here, upon contracts entered into or causes of action arising in this state, and that service of process on the agents of such corporations designated in compliance with that law should not be held to confer jurisdiction in other suits, and without regard to the citizenship of the plaintiffs, or the subject-matter or places of origin of the controversies. Proceeding to the consideration of this proposition, we find nothing in the law in question to warrant the conclusion that it was the intention to discriminate in favor of the citizens of Louisiana in the matter of bringing suits against foreign corporations; the discrimination made by the second section of the statute relating only to the place of origin of the right or cause of action, and operating as favorably to citizens of other states and countries as to citizens of this state. If, therefore, the present action would lie in favor of a citizen of Louisiana, it will lie in favor of the nonresident relator; and all the more is this true if the relator is a citizen of the state of Kansas, since the constitution of the United States in such case secures to him, in Louisiana, all the rights, privileges, and immunities which the state of Louisiana accords to her own citizens. Nor do we find anything in that law whereby the jurisdiction acquired by service of process upon an agent authorized by a foreign corporation to receive the same is limited to any particular class of cases."

Citation and service were properly and legally made upon Ingersoll, the person who was formerly designated by the defendant as its agent to receive service of process.

■ The alternative plea that Act No. 184 of 1924 is violative of section 1 of the Fourteenth Amendment to the Constitution of the United States is without merit. A state has the power, if she allows a corporation to enter her confines, to determine the condition on which the entry shall be made and the right to enforce any condition so imposed. The power to exclude embraces the power to regulate, and the power to enact and enforce such regulations.

■ When a foreign corporation undertakes to transact business in a state other than that in which it is incorporated, it submits itself to the authority of the courts of such other state and is bound by the statutory provisions respecting the method of such courts obtaining jurisdiction over it. United Oil & Natural Gas Prod. Corp. v. United Carbon Corp., 171 La. 374, 131 So. 52.

The exception to the citation and the plea to the jurisdiction were properly overruled.

■ The record discloses that at the time of trial in the lower court, plaintiff was totally disabled from doing manual labor. When the steel plates began falling, plaintiff, not having time to get out of the way, attempted to protect himself by holding them off of him. The weight was too much and finally broke him down. At that time, he felt a terrific pain in his back, and did not discover until later that his right leg was broken near the knee. He was immediately taken to El Dorado and placed in a hospital, where he remained until June 1st, at which time he was removed to his home. Prior to the accident, he never suffered with his back, but has suffered with it continuously ever since. The medical testimony showed that the leg is far from being straight and is some shorter than the other. It also shows that the femoral nerve is involved. Dr. Young, a specialist in neurology, testified that he made a complete neurological, physical and mental examination of plaintiff, and his diagnosis was a definite neuritis, involving the anterior crural nerve, commonly called the "femoral." All branches showed muscle atrophy, also showed nerve degeneration and muscle spasm, decrease in size of thigh, and changes in sensation. He further testified as follows:

"A. I found muscle spasm in the small of the back on the right side due to a condition there as a result of muscle branches of the second, third and fourth lumbar nerves, which go to make up the femoral nerve being involved. I found definite change in sensation from disturbance of the femoral nerve. I used a two point compass, tested sense of light, touched with wisp of cotton, and changes in pressure sensation. * * *

"A. Yes, there was a test in regard to the size of the leg, size of thigh, at least, the thigh measured two inches smaller than the opposite side, the electrical reaction which is the final test and most positive of all showed distinct reaction and degeneration, which is proved by test with faradic current and galvanic current, this test is the infallible test in neuritis, in testing nerve degeneration. All of these tests are purely objective.

"Q. Dr. Young, I believe I will ask you to state in detail the electrical test and what you found? A. The electrical test is made by placing one electrode in the region of the spine, over the spine, and using the other elec-

trode with the other hand and applying this electrode over the different motor points, or over different points where nerves enter the muscles, and where I got the most active reaction on the involved leg showed that it required approximately two and one-half times more currect of the galvanic type to produce a reaction, the faradic type instead of galvanic—the faradic type.is conducted solely by nerves and not muscles."

He also testified that he was positive that the decrease in size and condition of the muscles on the injured side are due to neuritis and not to nonuse, and that the condition of plaintiff was due to an accident; and that plaintiff was totally disabled from doing manual labor. The testimony of Dr. Young is corroborated in almost every detail by Dr. Furman.

Defendant offered the testimony of three doctors who were of the opinion that there was no back injury and that the pain plaintiff claims to suffer, was due to being forced to remain in bed in one position for a long time and nonuse of the leg, or possibly the awkward manner in which he made use of the leg. None of them was a specialist in neurology nor pretended to have made a neurological examination. The injury found by the specialist is a nerve injury and such an injury as would 'not necessarily be discovered unless a neurological examination was made. We think it abundantly proved that plaintiff, at the time of the trial below, was totally incapacitated to perform manual labor and that his incapacity was due to the injury received in the accident on March 9, 1930. He is therefore, under the law, entitled to compensation for the period of disability not to exceed four hundred weeks.

The only remaining question is upon what basis shall the weekly wage be computed? Plaintiff, at the time of the injury, was receiving $4.50 per day, and was employed to unload a car of steel strips, which the record shows would not exceed three days' time. Defendant contends that compensation should be fixed on the basis of 65 per cent. of his daily wage, multiplied by three, the most number of days it would have taken to complete the job. Plaintiff contends that it should be 65 per cent. of his daily wage, multiplied by seven, due to the fact that he was at work on Sunday, when injured, and the 'customary work week in the oil field is seven days. The record is clear that defendant did not have any regular working days per week, but when it had a car to unload, merely picked up its labor where it could and employed the labor for that particular job. When the job was completed, whether it took one day, two, or three, the labor was discharged. Therefore, since defendant.had no regular number of days per week in work of this kind, if that should have any bearing on the case, we are justified in accepting the general rule, which

is that six days constitute a working week. Boyett v. Urania Lbr. Co., 8 La. App. 132.

The Compensation Law of Louisiana (Act No. 242 of 1928, p. 357, § 8, subd. 3) now reads: "The term 'wages' as used in this act is defined to mean the daily rate of pay at which the service rendered by the injured employee is recompensed under the contract of hiring in force at the time of the injury, and anything herein contained to the contrary notwithstanding the maximum compensation to be paid under this act, shall be twenty dollars per week. * * *"

Section 8 of Act No. 20 of 1914, the original Compensation Act, reads as follows: "The term 'average weekly wages,' as used in this act shall mean the annual earnings of the injured employee divided by fifty-two. * * *"

In commenting on the change in the law, the lower court had the following to say: "The change in the law was evidently made for a purpose. Under the original act the daily rate of pay did not enter into the computation at all. You took the earnings for a year and divided that by 52, and if the party had not worked that long, you used the same method by applying it to the same industry or to another employee in the same business. Thus, under that, the number of days a man worked was the basis of computation; under the law in force now, a different rule applies, that of daily wages."

It then reviewed the jurisprudence of this state, discussing the following cases: Menzel v. Stevedoring Company, 7 La. App. 703; Morgan v. Nelms, 5 La. App. 414; Boyett v. Urania Lbr. Co., 8 La. App. 132; Clements v. Luby Oil Company, 14 La. App. 182, 125 So. 510; Danzy v. Crowell & Spencer Lbr. Co., 16 La. App. 300, 134 So. 267, and concludes that the reason for the different interpretations in those cases does not apply in this case, and further observes that we have in our jurisprudence cases using a three-day working week, a five and one-half day working week, a six-day working week, and a seven-day working week—all depending upon the number of days that particular industry was working regularly out of a possible seven-day week—and says:

"* * * If that particular industry is not working its men, or a part of its men, regularly, on a certain number of days per week then the rule does not apply, and some other rule must be found.

"The Boyett Case states that six days constitutes a week in the absence of allegation and proof that a different rule exists, and certainly this must mean as applied to that particular industry at that. particular time. Where that industry does have any rule or does not have any certain number of days per week, a week's work must be ascertained in some other way.

"This particular defendant did not have any regular working days per week (so far as the work involved in this case was concerned), but when it had a car to unload, it merely picked up its labor where it could, and hired that labor for that particular job.

"Bearing in mind that the act shall be liberally construed in favor of the employee and the changes made in the act as to the method of computation, we must conclude that in this particular case six days constitute the week, and plaintiff's compensation should be fixed at 65% x $4.50 x 6, or $17.55."

The reasoning of the lower court, based upon the decisions cited, appears to be sound; however, we prefer to base the opinion on this point on other grounds.

■ The Workmen's Compensation Act should be liberally construed in favor of its beneficiaries, and in doing so, the spirit and purpose of the act should be taken into consideration. It is a humane law, founded on public policy, and is the result of thoughtful, painstaking, and humane consideration. It was intended as a substitute for the defective and insufficient remedy theretofore existing for the adjustment of claims of employees, or their dependents, against employers for injury to or death of employees by accident in the course of their employment, and as a means whereby compensation might be had for every accidental injury or death coming within the provisions of the act, and the injured employee, or his dependents, in case of his death, be protected against the delays and the expense incident to the former remedy, and as a method whereby he or they might receive regulated compensation, payable at stated periods, so as most effectually to carry out the purpose of the act, which is to provide the injured employee, or his dependents in case of death, with payments periodically over a fixed space of time with which to meet his or their continuing necessities and not become a public charge, in the strict sense of the word. We can readily see that the public policy and humane thought behind the act are well defined.

The lawmakers originally fixed the amount to be paid in cases of this kind at a certain per cent. of the average weekly wage for the year prior to the date of the accident, and later, in their wisdom, fixed the amount of compensation for total disability at 65 per cent. of the employee's weekly wage, based upon his daily wage, for a period of not more than 400 weeks. As the law originally read, there were many cases in which the amount of compensation paid an employee was not sufficient to meet the purposes of the law, and, if we should adopt the contention of defendant in this case, that is, if an employee was employed for only one day a week and be injured on that day, that his compensation should be based on 65 per cent. of his weekly wage, or 65 per cent. of one day's wages per week. Clearly, the spirit and purpose of the Compensation Law would be done violence.

Economic conditions may be such that a man can only secure employment for one, two, or three days a week. It is not certain that such a condition will continue. It is to be hoped and expected that such condition will not last for a long time. Under defendant's contention, one injured while working only one, two, or three days a week, due to unusual economic conditions, should only be allowed compensation at 65 per cent. of his daily wage, based upon the number of days then employed, although he has become totally disabled and will never be able to work again, when if he had not been injured, he could possibly have secured employment for six days a week in the near future. The accident and injury have deprived him of the ability to work in the future, when he could secure full time employment.

To hold to defendant's theory would be to penalize the injured employee, because of unfortunate economic conditions prevailing at the time of injury with no right in the future to remove the penalty, should economic conditions become better. This, no doubt, was the reason of the change in the law from the average weekly wage to daily wage, and when the law reads to be paid weekly, based upon his daily wage, it means that his daily wage shall be multiplied by the number of working days in the week, which is generally understood at the present time to be six. If the five-day working week ever becomes a law, it no doubt will then govern. An exception to this rule would be where one was employed actually and specifically to work only seven days a week. It would not be an exception where one was employed actually and specifically to work only three days a week, for the reason that such employment would not prevent the employee from working some other place for the remaining three days, if he could secure a job. Under defendant's contention, an employee might secure employment for six days and work each day with a different employer, and then, although he was working a full six-day week, if he met with an accident on any day in the week, he would only be entitled to compensation for 65 per cent. of his daily wage per week of one working day. Such could not be the purpose or intent of the law and is not the law as written.

■ An employee who is accidentally hurt, and whose case comes under the provisions of the Louisiana Compensation Act, is entitled to compensation based upon his daily wage, multiplied by six, the usual number of working days per week, whether he was employed for a lesser number of days or not, and only in such cases as where he is employed actually and specifically for seven days a week is he entitled to more than six days a week. In

this case, plaintiff was not employed to work seven days a week. He was employed to assist in unloading a car of steel strips which at the most would not have taken more than three days. Therefore, plaintiff is entitled to compensation at the rate of 65 per cent. of the weekly wage, based upon his daily wage of $4.50 per day, for a six-day week, or 65 per cent. of $4.50, multiplied by six, for the period of disability, not to exceed four hundred weeks.

The judgment of the lower court is correct and is affirmed, with costs.