## SMITH v. BROWN PAPER MILL CO., Inc.
## No. 4674.

Court of Appeal of Louisiana. Second Circuit.

Feb. 5, 1934.

Julius T. Long, of Shreveport, for appellant.

Shotwell & Brown and Theus, Grisham, Davis & Leigh, all of Monroe, for appellee.

MILLS, Judge.

Charles H. Smith brings this action against his employer, Brown Paper Mill Company, Incorporated, claiming compensation for four hundred seven-day weeks at $9.10 per week, and $200 medical expenses, under the provisions of Act 20 of 1914, as amended; and, in the alternative, damages in the sum of $35,000 under article 2315 of the Civil Code. He alleges that while in the course of his employment, he was compelled by the order of defendant to submit to an injection of typhoid serum in the left arm, by a trained nurse in the employ of defendant; that as a direct result of the inoculation his left arm was permanently paralyzed and the shoulder and right side, abdomen, and hip are seriously and permanently impaired, rendering him unable to ever again do work of any reasonable character.

In support of the alternative plea, he alleges that the injection was improperly and negligently given, in that it was made too near the shoulder so that it affected the musculospiral nerve.

■ The correctness of the overruling by the lower court of an exception of no cause or right of action, and a motion to strike out, is not before us for review, as defendant did not appeal nor answer the appeal of plaintiff.

The allegations of the petition denied in the answer are that the employee was required to take the treatment, and the claim to a seven-day week. The answer affirmatively sets out that the nurse was permitted to give these inoculations for the benefit of the employees and the people of the community and only at their request; that in the present instance it was given in the proper manner and without accident or negligence; that plaintiff's admitted impairment was a hazard incidental to the treatment so rare in its occurrence that it could not be foreseen and guarded against.

Plaintiff appealed from a judgment rejecting his demand.

The testimony shows that the defendant maintains in its mill a first-aid room for the speedy treatment of sick or injured employees and engages a trained nurse to take charge of the room and administer necessary treatments. That because of this service its rates on employer's liability insurance are decreased. The woman in charge was an experienced and competent operator. It is not improper for such a nurse to give injections of typhoid serum. This serum is injected into the system with a hypodermic syringe having a needle one-half inch long. The proper and accepted method is to lift the skin from the muscle tissue with the thumb and forefinger of one hand and with the other force the needle through the skin and discharge the serum between the skin and the muscular tissue.

Owing to the pollution of its waters due to flood, the Health Unit of Ouachita Parish was giving these inoculations to the citizens free of charge. The Brown Paper Mill Company obtained a supply of serum from the parish and instructed and authorized its nurse to give the treatments to its employees and to other people of the vicinity. A notice was posted upon the company's bulletin board at its plant, the wording of which is disputed. Plaintiff contends that it read: "To All Employees of the Brown Paper Mill:

Report to first-aid room for typhoid shots." The nurse testifies that she wrote and posted the notice, but that she could not remember its exact wording; that according to her recollection it read something like: "Those desiring typhoid shots report to the first-aid room this week." The sign was not offered in evidence. It is not shown that signs were posted by the company anywhere except at its plant. It had been the custom for five years for the company to post these notices and give these shots. It was not only inconvenient, but impracticable, for the workmen to go to the place, five miles distant, where shots were given by the parish authorities. On this point the nurse testifies: "The main reason we give them out there, the men were working 8 or 9 hours a day and had no way to come to town and besides that they would get off from work after the Health Unit was closed and when they went to work they didn't have time to go. The hours they worked they couldn't get to the Health Unit."

On April 10, 1932, at about 9:30 a. m., while the cutter on which he was working was temporarily stopped, plaintiff, who had already received from the nurse at least two of the series, stepped into the first-aid room and was given another injection. She says it was given in the left arm about two inches below the point of the shoulder, in the deltoid region of the arm, under the skin, and in the usual and proper manner. He says that the needle was driven into the muscle. Smith experienced no immediate ill effects, but after returning to work, about 2 o'clock in the afternoon, he felt a tingling sensation in the fingers of his left hand. By 3:30 his arm had begun to go dead, and pain had increased to such an extent that he was relieved from work and went home. He awoke from a troubled sleep at about 9 o'clock that night to find his left arm paralyzed. The disability has extended to his abdomen, side, and hip, so as to render him totally, and we think permanently, disabled.

■ The facts in the case are so little in dispute that as to the right to compensation the issues are reduced to two: Was there an accident within the terms of the act; and, if so, did it arise out of the employment?

Section 38 of Act No. 20 of 1914, as amended by Act No. 38 of 1918, reads in part: "* * * that the word 'Accident,' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening, suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury."

There may be some question of degree, but there can be no doubt that the puncturing of the skin and tissues with a hypodermic needle and the forcible injection into the system of a foreign serum is an act of violence to the physical structure of the body. In this case the act itself was contemplated, but the disastrous results directly attributable to the act happened suddenly and were wholly unforeseen and unexpected.

That the injection caused the disability is admitted. Why it did so is a question made difficult of solution by the usual hopeless conflict in the medical testimony, in this case extending even to the location of the musculospiral nerve. It seems that there are two possible explanations: The occurrence of what is termed "serum disease," or an injury to the musculospiral nerve. The disease occurs so rarely that it is little understood by the medical profession. The danger from it is not of sufficient gravity to discourage the giving of the treatment. It may result from the use of any serum injected into any part of the body. An injection in the leg may result in paralysis of the arm. The authorities say that it is due to a rare hyposensitiveness peculiar to the individual. Neither its symptoms nor the final paralytic result become apparent as quickly as occurred in the present case. The investigation of this unusual medical complication has been most interesting. We could write several pages in attempting to explain what the doctors themselves are unable to make clear. We will, however, content ourselves by stating that in our opinion the paralysis was caused by the destruction of the musculospiral nerve, not by serum sickness, but by the injection of the serum into or in the area of the nerve, causing direct injury or shock. We draw this conclusion from the tingling sensation felt in the fingers so soon after the puncture of the arm, the resulting paralysis occurring within twelve hours, and the absence of any rash or skin eruption. Also from the fact that the two or three previous injections had failed to injuriously affect the patient. We are not prepared to say just what the nurse did, but it is evident that she accidentally and unintentionally gave this injection in a different manner from those given before, to have caused the startlingly different result.

Dr. J. W. Williams, the parish health officer, testifying for defendant, says:

"Q. Typhoid fever serum supposed to be given in the muscles? A. Try to keep it out of the muscle, but we certainly put it a million times in the muscle."

This is not a case where a pre-existing disease is activated or accelerated by an accident, but is one where the injury originates directly from the accident. This case is clearly distinguishable from that of Jackson v. Travelers' Insurance Company, 151 So. 790, decided by this court January 3, 1934, wherein the disability was due to a progressive disease without evidence of trauma, tearing, or the intervention of any event that could be construed as an accident.

We then find that the plaintiff did suffer an accident in the course of his employment to which his injury and resulting disability are directly attributable.

It is well settled by the terms of section 2 of the Workmen's Compensation Act, and by our jurisprudence construing that section, that an accident, to be compensable, must both arise "out of" and happen in the "course of" such employment. It occurring in this case in the place and during the hours of labor, it is admitted to have happened in the course of the employment.

■ Did it arise out of the employment?

On this phase of the case the learned trial judge, in a written opinion, states: "Clearly, this injury arose during the course of the employment (that is as to the time of injury), but the court cannot see how it can be claimed it arose *out of the* employment. In other words, what effect did the nature of plaintiff's employment have in causing the injury? None that this court can find from the testimony of any of the expert witnesses or the testimony of the plaintiff. It was caused by the typhoid 'shot'. But the doctors say it sometimes happens in rare cases to certain individuals; there is no evidence that it was caused, in any degree whatever, by the character of the plaintiff's employment. As a matter of record the testimony shows that a large number of plaintiff's fellow workmen and the plaintiff himself, on previous occasions, had; taken the 'shots' and this was the only case in which injury resulted. The testimony further shows a number of persons were also given shots from this same serum and no injury resulted in other cases. This court does not think the evidence shows the injury was due to the employment, and therefore the plaintiff cannot recover under the compensation law."

The meaning of the term "arising out of" has been fully expounded in our jurisprudence. There must be a causal connection between the conditions under which the work is required to be performed, and the resulting injury. The employee must have been engaged in the discharge of some authorized function or duty which is calculated to further directly or indirectly the master's business. The risk must have been greater for the workman than for a person not so employed. Considering the whole situation, the injury must have followed as a natural consequence of the work. The workman need not have been actually engaged in his work at the time of his injury. It is sufficient if the accident occur in the course of the employment while the workman is availing himself of conveniences maintained by the employer, though not directly connected with the work. It must be an injury which can fairly well be traced to a hazard reasonably incident to the employment. It excludes risks common to every one and to which the workman would have been exposed irrespective of the employment. However, the question cannot be solved by phrases. Each case must be determined from a fair consideration of its own facts, and not by hairsplitting technicality. Myers v. Louisiana Ry. & Nav. Co., 140 La. 937, 74 So. 256; Dyer v. Rapides Lbr. Co., 154 La. 1091, 98 So. 677; Ferguson v. Cady-McFarland Gravel Co., 156 La. 871, 101 So. 248.

Applying these tests to the facts before us, we find that the nurse was not employed from altruistic motives or for the benefit of mankind in general, but because her presence and the service rendered by her were a direct benefit to her employer, in that its insurance rates were reduced and loss of time from work by its employees was minimized. The testimony of the nurse quoted supra shows that because of the distance to be traveled and the hours of employment, it was so inconvenient and impracticable for its employees to take these shots anywhere but at the plant that in all probability, except for the opportunity offered by the company, the workmen would not take the shots at all.

The workman owed a duty to his employer to avail himself of the facilities offered to prevent illness and absence from work. The company's general manager testified that a typhoid fever epidemic would be most disastrous to the industry.

In Gasca v. Texas Pipe Line Co., 2 La. App. 483, wherein plaintiff was struck by lightning while seeking shelter under a tree, the court said: "It is not only the privilege but the duty of an employee to seek shelter from the elements in that he might be able to continue his work and not endanger his health and disrupt his employment."

While it is clearly shown that its workmen were not ordered or required to take the shots at the plant, the wording of the posted notice may well have been interpreted by the average mill worker as such a requirement.

In this case the plaintiff testifies that he so understood it, and was so told by the company doctor. In any event, the convenience of the facility and the posted notice constituted a suggestion, an invitation and urge, calculated to induce an employee to submit to the treatment who might not otherwise have done so. While some persons in the neighborhood were also inoculated at the plant, there was no posted notice urging or inviting them to use its facilities. There was no connection between the plant and themselves, making it their business to do so. We find, then, that the chances of submitting to the inoculation were very much greater in the case of workmen than for the general public; that it was to the interest of the employer to give these shots; and that they were given because of this interest. We can see no difference between the action of a workman availing himself of this facility and that of one using any other convenience furnished by the plant for the workmen. It is argued that the reference to facilities in the cases means permanent facilities. If, at the time of his injury, the workman was using a facility furnished by his employer that he was at least invited to use, we fail to see how the duration of the facility can affect the legal consequences.

In the Gasca v. Texas Pipe Line Co. Case, supra, on an application for rehearing, Judge Carver said: "We prefer to place our decision on the ground that the presence of Gasca under the tree increased the danger of his being struck by lightning because the tree was more apt to be struck rather than that his presence increased the danger of his being injured by the particular bolt which did strike the tree."

So, in the present case his employment rendered plaintiff more apt to submit to the inoculation, though it did not increase the danger of injurious results.

The hypodermic syringe was the instrument of the employer used by its nurse in performing the work assigned to her. The plaintiff was injured in the course of his employment by that use. Brown v. Vacuum Oil Co., 171 La. 707, 132 So. 117.

If not compelled to take the treatment, it was at least incidental to his employment.

Donald J. Kiser, in his article on Workmen's Compensation Acts for Corpus Juris, states the law to be that: "Where the employee is injured while doing something not strictly within his obligatory duty, but which is incidental thereto, he may be entitled to compensation."

In the Brown Case the employees were scuffling over a water hose.

In Conaway v. Marine Oil Co., 162 La. 147, 110 So. 181, and Schexneider v. General American Tank Car Corp., 5 La. App. 84, a workman was injured by the accidental discharge of a pistol in the hands of a fellow servant, and in Catherin v. Commercial Casualty Ins. Co., 18 La. App. 690, 138 So. 455, by the unexpected firing of an old gun barrel found by his helper.

If in those cases the court found a causal connection between the accidental injury and the employment, certainly there is such a connection where an accidental injury results from an intended "shot" from a hypodermic syringe.

Considering the above facts and jurisprudence, we find ourselves unable to agree with the finding of the trial judge. We conclude that the accident did arise out of the employment and that the defendant is liable under the Workmen's Compensation Act.

It is admitted that plaintiff was earning $2 per day. His testimony that he frequently worked seven days a week is not sufficient to warrant an allowance for that period. To support a claim for a seven-day week, a specific agreement to that effect must be proven. King v. American Tank & Equipment Corp. (La. App.) 144 So. 283; Olinde v. Arundel Corp. (La. App.) 151 So. 439.

The plaintiff has failed to prove his claim for medical expenses.

Having found that this case comes under the provisions of the Workmen's Compensation Act, it is unnecessary for us to consider the claim for damages under article 2315 of the Civil Code.

For the reasons given above, the judgment appealed from is reversed, and judgment is now rendered in favor of plaintiff and against defendant for weekly compensation in the sum of $7.80 per week during disability not to exceed four hundred weeks, beginning April 10, 1932, with 5 per cent. per annum interest on each weekly payment from its due date until paid, and all costs of both courts. This court is without power to fix the fees of the expert witnesses. Code of Practice, arts. 462 and 551; State v. Cole, 33 La. Ann. 1356; Price v. Town of Ruston (La. App.) 148 So. 512; Riley v. Life & Casualty Ins. Co. (La. App.) 145 So. 33.

DREW, J., concurs in the decree of the court, but does not agree with the holding of the court in the case of Jackson v. Travelers' Ins. Co., which is cited herein.