**JAMES JULIAN, INC. OF DELAWARE, Employer–Appellant,**

v.

**Gary F. TESTERMAN, Employer–Appellee.**

**No. 98A–05–002–HLA.**

Superior Court of Delaware, New Castle County.

Submitted: Dec. 1, 1998.
Decided: March 18, 1999.

See 737 A.2d 530.

 

Beth H. Christman, Casarino, Christman & Shalk, Wilmington, for Employer Below–Appellant.

Michael Weiss, Yvonne Takvorian Saville, Wilmington, for Employee Below–Appellee.

## OPINION

ALFORD, Judge.

### I. INTRODUCTION

On October 4, 1995, Gary Testerman ("Testerman") was fatally injured while employed with James Julian, Inc. of Delaware ("Julian"). His widow, Nora Testerman, filed a Petition for Compensation Due on September 22, 1997, requesting death benefits under Delaware's Workers' Compensation Statute. A hearing on the Petition was held before the Industrial Accident Board ("Board") on April 2, 1998. The sole issue before the Board was whether Testerman was in the course and scope of his employment at the time of the accident. On April 15, the Board issued a decision granting Testerman the Petition for death benefits. Julian filed a timely appeal in this Court. On appeal, Julian argues that the Board erred as a matter of law and fact when it found that Testerman was entitled to compensation for death benefits. This is the Court's decision on appeal.

### II. FACTS

Gary Testerman was employed as a truck driver for Julian for approximately two and half years. He worked during the second shift, between 7:00 P.M. and 5 A.M. On October 4, 1995, at 5:20 A.M., Corporal Philip Strohm of the Delaware State Police was notified of an accident on Route 896. On the day of the accident, Corporal Strohm was assigned to the Fatal Accident Investigation and Reconstruction Unit in New Castle County. In his testimony on behalf of Testerman, Corporal Strohm stated that he arrived at the accident scene at approximately 6:05 A.M., and proceeded to collect physical evidence, conduct measurements, take photographs, contact witnesses, and conduct interviews. Corporal Strohm was assisted by Corporals Weaver and Pine, who also responded to the accident scene.

Corporal Strohm testified that the accident occurred on Route 896, between Route 40 and Corporate Boulevard. According to Corporal Strohm, Testerman was struck and killed by a car in the northbound lane of Route 896 at approximately 4:46 A.M. He testified that Testerman was a pedestrian at the time of the accident. Corporal Strohm made a drawing of the accident scene and a scaled diagram of the scene was admitted into evidence.

Corporal Strohm testified that Route 896 was under construction at the time of the accident. The road was divided into two—the northbound portion had a straight through-lane–a right turn lane into a construction area, and a left turn lane which allowed northbound vehicles to turn left onto Corporate Boulevard. The southbound lane, on the other hand, consisted of one through-lane, with an entry lane from Corporate Boulevard. Unlike the northbound lane, the southbound lane had an improved shoulder.

The actual spot of the impact is arrived at by conjecture based on Corporal Strohm's analysis of the accident scene. He determined that the impact occurred on the northbound side of Route 896. He testified that Testerman had parked his pickup truck on the improved shoulder. Corporal Strohm observed that the pickup truck's engine was running; its four-way flashers on; and its headlights activated. Testerman's dump truck was parked in the construction area. Corporal Strohm stat-

ed that the point of impact was approximately sixty-five feet from Testerman's dump truck. He stated that Testerman's dump truck hood was down, whereas the other dump trucks had their hoods up.

Earl Wilson, Sr., ("Wilson") testified on behalf of Testerman. On the day of the accident, Wilson had completed his job and left for the day before the accident. He testified that he worked as a dump truck driver on the same shift as Testerman on the day of the accident. He and Testerman had the same job duties. The duties included driving the dump trucks to a site near Lum's Pond, loading the trucks with fill, then driving back to the work site to dump the material. The purpose was to build up the shoulders on Route 896. Wilson stated that during this job, the drivers traveled Route 896 from Lum's Pond to where they dumped the fill, traveling that route approximately forty times a day.[1] He testified that he did not believe that the foreman was at the Route 896 construction site on the day of the accident.

According to Wilson's testimony, drivers are instructed to leave the hood and body of their truck up at the end of the day so that mechanics can service the truck. Drivers are informed that failure to leave the hood and body of their truck in an upright position would result in disciplinary action. Drivers are also instructed to complete a post equipment check form and a mileage form at the end of the day. Wilson stated that failure to do so would result in disciplinary action. Wilson further testified that construction signs were posted at the Route 40/Route 896, and at the I–95/ Route 896 intersections.

Testerman's wife for almost twenty years, Norma D. Testerman, was also employed by Julian as a truck driver. She drove the same dump truck on the day shift. Norma Testerman testified at the Board hearing that she and her husband discussed their travel route to and from work in case their personal vehicles broke down. She stated that generally, Testerman traveled home by crossing Route 896 by way of Corporate Boulevard, to Pinaker Drive, over to Pleasant valley Road to Delaware Route 4. From Delaware Route 4, he would then make a left onto Interstate 95.

Norma Testerman testified that Julian's construction plans included building two new northbound lanes on Route 896, widening the existing lanes and resulting in new southbound lanes. She testified that construction signs were posted at the intersection of Route 40 and Route 896. She also agreed with Wilson that drivers would be written-up for failure to complete a driver's Vehicle Inspection Report ("VIR"), a mileage form, and to raise their truck's hood. She testified that an employee could be dismissed after three write-ups.

Robert Penland ("Penland") testified on behalf of Testerman. Penland, also a truck driver employed by Julian, was present at the time of the accident. He testified that he was standing with another truck driver, Isaac Humphries ("Humphries") and facing the road when the accident occurred. He stated that he saw someone park on the shoulder of Route 896 and walk across Route 896. Penland stated he did not know that it was Testerman who was crossing the street because it was dark, and Humphries, who was standing in front of him, was blocking his view. He then heard a big bang and saw Testerman being thrown in the air and landing. He testified that Testerman had crossed the new double lines when the accident occurred. Penland further testified that Julian did not require drivers to use their personal vehicles on the job, and

1. A Julian witness, Jacob Bailiff, an Area Superintendent at the time of the accident, testified that even though most drivers referred to the area where they collected fill as "Lum's Pond," the place where they actually collected fill was on Howell School Road. Because all other witnesses, including counsel and the Board refer to this area as "Lum's Pond," the Court will also refer to the place where truck drivers collected fill as "Lum's Pond."

that the job duties did not require drivers to cross Route 896.

Humphries also testified on behalf of Testerman. He worked during the same shift as Testerman. He stated that he was not speaking with Penland at the time of the accident. Although there was some conflict as to where Humphries was situated at the moment of the impact, he confirmed Penland's testimony that the hood on Testerman's truck was down.

Len Gravatt ("Gravatt") testified on behalf of Testerman. Gravatt was also employed by Julian as a truck driver at the time of the accident. Gravatt worked during the same shift as Testerman. He testified that he was talking to both Humphries and Penland when the accident occurred. Like Penland, Gravatt heard a loud thump and saw someone being thrown in the air. At the time, he did not know that it was Testerman. He also confirmed that Testerman's hood was down, and that drivers who did not leave the hood of their trucks in an upright position would be subject to reprimand.

Raymond Myers ("Myers") testified on behalf of Testerman. Myers was also employed by Julian as a truck driver and worked the same shift as Testerman. Myers testified that being the first person to park his truck, he was not present when the accident occurred. He also stated that a driver could be dismissed if he was written-up three times during one year for failing to leave a truck's hood in an upright position.

August Meadows ("Meadows") testified on behalf of Julian. At the time of the accident, Meadows worked as a job site safety inspector for Julian. He testified that he arrived approximately three to five minutes after the accident. He notified the police about the accident. When he learned that it was Testerman who had been involved in the accident, he called Jim Hoover ("Hoover"), Safety Director for Julian. Meadows further testified that he checked Testerman's truck on two occasions to determine if Testerman had left

personal items. He looked through Testerman's truck, once with Humphries, and a second time, with Hoover. Meadows did not find Testerman's personal items in the truck on either occasion. He confirmed Penland's testimony that Julian employees were not required to walk across Route 896, and were not asked to use their personal vehicles to perform their duties. Meadows also testified that after the accident, he and Humphries made the assumption that Testerman was struck as he was walking from his personal vehicle towards his dump truck.

Finally, Jacob Bailiff ("Bailiff") testified on behalf of Julian. Bailiff, also a Julian employee, worked as an Area Superintendent at the time of the accident. Bailiff testified that the construction plan on Route 896 included adding lanes to the northbound and southbound lanes. He also stated that during the construction project, truck drivers obtained fill from the Lum's Pond area. Bailiff testified that Julian required truck drivers to report to work and if work was unavailable, they would be paid for one hour. He also testified that night shift employees were paid to work from 7:00 P.M. to 5:00 A.M. Bailiff agreed that once a driver completes his last haul and fulfills all the requirements of the job duty, he would be permitted to leave before the work shift ended. He also confirmed Penland's and Meadows' testimonies that Julian did not require its employees to park on the southbound shoulder of Route 896, nor did it require them to use their personal vehicles while working on the construction project.

A hearing on Testerman's petition for Compensation Due was held on April 2, 1998 before the Industrial Accident Board. The sole issue before the Board was whether Testerman was in the course and scope of employment at the time of the accident. The Board issued a decision on April 15, 1998, granting the petition for death benefits, finding that Testerman was in the course and scope of his employment

with Julian when he was killed in the accident. The Board also granted Tester-man attorney's fees pursuant to 19 DEL. C. § 2320(g)(1). On May 1, 1998, Julian filed a notice of appeal with this Court from the Board's decision.

## III. STANDARD AND SCOPE OF REVIEW

The Court has reviewed the record in its entirety, including Corporal Strohm's scaled diagram of the accident scene, and other evidence admitted into the record at the Board hearing. The Supreme Court and this Court have repeatedly emphasized the limited appellate review of the factual findings of an administrative agency. When factual determinations are at issue, the Court will take due account of the experience and specialized competence of the agency and of the purposes of Delaware's worker's compensation law.[2] The Court's review, in the absence of actual fraud, will be limited to a determination of whether the agency's decision was supported by substantial evidence on the record before the agency.[3]

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[4] This Court does not weigh the evidence, determine questions of credibility, or make its own factual findings.[5] The Court will consider the record in the light most favorable to the party prevailing below and will resolve all doubt in its favor.[6]

## IV. DISCUSSION

Delaware's Workers' Compensation Act ("Act") requires employers to compensate employees "for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence...."[7] The Act states, in relevant part, that a personal injury sustained by an accident "arising out of and in the course of employment" exists while:

> the employee is engaged in, or about the premises where the employee's services are being performed, which are occupied by, or under the control of, the employer (the employee's presence being required by the nature of the employee's employment), or while the employee is engaged elsewhere in or about the employer's business where the employee's services require the employee's presence as a part of such service at the time of the injury [ ].[8]

The philosophy of the Act is to obviate the need for litigation and to give an injured employee, irrespective of fault, prompt compensation.[9] Thus, the law must be interpreted liberally to fulfill its intended compensation goal under § 2304.[10] When interpreting the Act, this Court bears in mind that when factual determinations are at issue, a reviewing Court must take into account the experience and specialized competence of the

---

**2.** *See State v. Glascock,* Del.Super., C.A. No. 97A–01–001, Graves, J. (July 14, 1997) (Mem. Op.), 1997 WL 524078, at *4 (citing *Histed v. E.I. Du Pont de NeMours & Co.,* Del.Supr., 621 A.2d 340, 342 (1993)).

**3.** *See* 29 DEL. C. § 10142(d); *See also Stoltz Management Co. v. Consumer Affairs Bd.,* Del. Supr., 616 A.2d 1205, 1208 (1992); *Johnson v. Chrysler Corp.,* Del.Supr., 213 A.2d 64, 66–67 (1965).

**4.** *See Oceanport Ind. v. Wilmington Stevedores,* Del.Supr., 636 A.2d 892, 899 (1994); *Battista v. Chrysler Corp.,* Del.Super., 517 A.2d 295, 297 (1986), *app. dism.,* Del.Supr., 515 A.2d 397 (1986).

**5.** *Johnson,* 213 A.2d at 66.

**6.** *See Thomas v. Christiana Excavating Co.,* Del.Super., C.A. No. 94A–03–009, Cooch, J., 1994 WL 750325 (Nov. 15, 1994) (Memo Op.) at 5.

**7.** *See* 19 DEL. C. § 2304.

**8.** *See* 19 DEL. C. § 2301(15)(a).

**9.** *Histed,* 621 A.2d at 342.

**10.** *Id.*

Board.[11]

Julian first argues that the Board's decision must be reversed because Testerman has not met the statutory requirement under 19 DEL. C. § 2301(15) for compensability at the time of the accident. Julian argues that Testerman failed to prove the two requirements set out by the Act, i.e., that he has not shown that he was involved in an accident "arising out of and in the course of employment" and that he was "on or about the premises where the employee's services are being performed."[12]

The Board made several factual determinations in its April 15, 1998 decision. It determined first that the hours of employment set by Julian for the night shift were between 7:00 P.M. and 5:00 A.M.[13] Based upon Corporal Strohm's testimony, the Board found that Testerman was killed at approximately 4:46 P.M., before his work shift ended.[14]

It also found that Julian requires all its drivers to raise the hoods of their dump trucks and to fill out a VIR and mileage report before the end of the work shift.[15] The Board determined that Testerman did not raise his truck's hood and did not complete the VIR, nor the mileage form.[16] The Board considered the fact that under Julian's policy, a driver's failure to raise his truck's hood and neglecting to complete the VIR and mileage forms after three write-ups could result in dismissal. The Board found that because Testerman had already been written up twice, he could have reasonably believed that he would have been subject to being terminated.[17]

The Board found that Testerman was "in the course and scope of employment" essentially because Testerman was struck while he was walking in the direction of his dump truck. The Board stated that Testerman "had work duties to perform" and that "the purpose of [his] journey [across Route 896] was to complete his work duties."[18] The Board made a finding that the reason Testerman "left the safety of his vehicle was to perform a requirement of the employer's business—he needed to complete his job duties ... his presence was required to complete those duties."[19]

However, the Board determined that Testerman's trip on his personal vehicle on southbound Route 896 to ask his supervisor whether he should report to work the following work shift was not work-related. The Board determined that Julian's policy was to show up to work unless told otherwise.[20]

In its opening and reply briefs, Julian argues that Testerman was not in the course and scope of employment at the time of the accident because he was not driving the dump truck at the time of the accident. Julian's argument hinges on the proposition that the only requirement laid out by Julian was "to be in or immediately next to the Julian dump truck" and that Testerman's "only additional duties included inspecting the truck, raising the hood and filling out forms in the truck." Julian also argues that Testerman had abandoned the job site when the accident occurred. Julian contends that Testerman's injury did not arise out of and in the course of his employment because Julian did not require its employees to (1) park on the southbound shoulder of Route 896; (2) use their personal vehicles during the construction project; nor (3) walk across Route 896.

11. *Johnson,* 213 A.2d at 66.

12. *See* 19 DEL. C. § 2301(15)(a).

13. *See* INDUS. ACCIDENT BD. DECISION of April 15, 1998 ("BD. DECISION"), at 9.

14. *Id.*

15. *Id.* at 10.

16. *Id.*

17. *Id.* at 11.

18. *Id.* at 10.

19. *Id.* at 14.

20. *Id.* at 10.

■ Under the Act and existing case law, the question of whether an employee is acting within the course and scope of employment has been stated to be a legal conclusion determined by the facts.[21] Since questions relating to the course and scope of employment are highly factual, it is well established that they must necessarily be resolved under a totality of circumstances test.[22] This Court does not weigh evidence, determine questions of credibility, or make its own factual findings in a worker's compensation proceeding.

■ This Court finds that the Board's determination that Testerman was still "on the clock" and walking towards his dump truck to complete his job duties at the time of the accident, was supported by substantial evidence. The Board relied primarily on Corporal Strohm's testimony and scaled drawing which showed that Testerman's personal vehicle was parked directly across from his dump truck. Corporal Strohm's testimony and drawing also showed that Testerman was struck on Route 896 as he walked towards his dump truck. Corporal Strohm's investigation concluded that Testerman was struck and killed at approximately 4:46 A.M., prior to the end of his work shift.

The Board also relied on Penland's testimony that Testerman was walking towards his dump truck at the time of the accident. The Board relied on other witnesses, including Meadows, who testified that there were *no personal items* in Testerman's dump truck. The Board concluded that Testerman was walking towards his dump truck to complete his work duties and not to accomplish a personal mission. The Board relied on the fact that Testerman had not raised his truck's hood, and had not completed the VIR and mileage forms

to arrive at the conclusion that Testerman was struck before completing his job duties.

■ Julian argues that the Board erred in determining that the "going and coming" rule is inapplicable in this case. Delaware follows the "going and coming" rule, which precludes an employee from receiving workers' compensation benefits for injuries sustained while traveling to and from his or her place of employment.[23] The rationale behind the "going and coming" rule's bar to recovery is that, when traveling to and from work, the employee simply confronts the same hazards, and, therefore, experiences the same risks encountered by an individual on a personal excursion.[24] The Board determined that Testerman was not engaged in a daily commute at the time of the accident. This Court finds that the Board's determination that the "going and coming" rule is inapplicable to the instant case to be supported by substantial evidence.

Julian further argues that Testerman would not be deemed to be within the course and scope of his employment under the Restatement (Second) of Agency. Since the Court finds that the accident was arising out of and during the scope of Testerman's employment under the worker's compensation statute, the Court finds it unnecessary to determine Testerman's status under the Restatement (Second) of Agency.

Julian also argues that Testerman was not injured on or about Julian's premises, and, therefore, is not eligible for workers' compensation benefits. The basis of this argument is that Testerman was injured in an area which was not within the control of the employer. Julian states in its brief that Julian "was not required under cur-

**21.** *See Collier v. State,* Del.Super., C.A. No. 93A–06–022, Del Pesco, J., 1994 WL 381000 (July 11, 1994) (ORDER) (citing *Histed,* 621 A.2d at 342).

**22.** *Histed,* 621 A.2d at 345.

**23.** *See Tickles v. PNC Bank,* Del.Supr., 703 A.2d 633, 636 (1997); *Devine v. Advanced Power Control, Inc.,* Del.Super., 663 A.2d 1205, 1210 (1995); *Histed,* 621 A.2d at 343.

**24.** *Tickles,* 703 A.2d at 636, *Histed, Id.*

rent Delaware law to anticipate that an employee might leave its site in the dark and decide to walk across the road in an area where there was no intersection, crosswalk or traffic light and then somehow guard the safety of that employee." [25]

▪ Under the workers' compensation statute, an employee injured "on or about the premises where the employee's services are being performed" will be compensated by his or her employer.[26] It is well settled that when interpreting the Act, it is a court's responsibility to construe and administer it with reasonable liberality.[27] Viewing the record in its entirety, including Corporal Strohm's scaled drawing of the accident scene, the Court finds that even under a literal reading of the Act, Testerman was injured on Julian's premises. It is undisputed that Testerman was walking towards his dump truck and a few yards away from his dump truck when he was struck. Although he was struck on a road that was being used by the public, the immediate area was under construction by Julian.

For the reasons set forth herein above, the Court finds that there was substantial evidence in the record which a reasonable mind might accept as adequate to support the Board's conclusion that Testerman's accident took place during the course and within the scope of employment. The Board's decision is hereby **AFFIRMED.**

**IT IS SO ORDERED.**

**25.** *See* Julian's Opening Brief, at 30.

**26.** *See* 19 DEL. C. § 2301(15)a.

**27.** *Histed,* 621 A.2d at 346.