**E.I. DUPONT DE NEMOURS & CO.,**
**Employer Below–Appellant,**

v.

**Barbara FAUPEL, Claimant**
**Below–Appellee.**

**C.A. No. 03A–04–014–RRC.**

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 3, 2003.
Decided: Jan. 30, 2004.

Robert W. Ralston, Esquire, Wilmington, Delaware, Attorney for Employer Below–Appellant.

Joseph W. Weik, Esquire, Weik, Nitsche, Dougherty and Componovo, Wilmington, Delaware, Attorney for Claimant Below–Appellee.

## OPINION

COOCH, J.

### I. INTRODUCTION

This is an appeal of a decision of the Industrial Accident Board ("IAB") holding that Barbara Faupel's ("Faupel") injury, Guillain–Barré Syndrome/chronic inflammatory demyelinating polyneuropathy, which resulted from an influenza vaccination administered to her by her employer E.I. duPont De Nemours & Co. ("DuPont"), was within the course and scope of her employment and therefore compensable under the Workers' Compensation Act. This Court finds that there was substantial evidence to support the IAB's decision and affirms the decision of the Board. This Court holds that a flu vaccination, resulting in injury, "may be covered [by the Workers' Compensation Act] if there is a combination of strong urging by the employer and some element of mutual benefit in the form of lessened absenteeism and improved employee relations." [1] This is an issue of apparent first impression in Delaware.

### II. FACTUAL AND PROCEDURAL HISTORY

Faupel was employed by DuPont from March 1970 until October 29, 2001.[2] In

---

[1]. Arthur Larson, *Larson's Workers' Compensation Law,* § 27.03[2] (2002).

[2]. *Barbara Faupel v. E.I. duPont De Nemours & Co.,* IAB Hearing Transcript at 64 (March

2000, Faupel was promoted to an "executive" level position and moved to DuPont's offices in the "Hotel DuPont".[3] In 1976, Faupel had received the Swine Flu vaccination, which was administered at work by DuPont, and she became ill after receiving the vaccination.[4] Faupel declined to receive any flu vaccinations between 1977 and 2001.[5] Faupel testified that she decided to receive the flu vaccination in October 2001 because she felt that in her new position she needed to be "on the job" for her boss.[6] She also stated that her family doctor suggested that she get a flu vaccination because of her age and because she was also caring for elderly parents.[7] Faupel received a flu vaccination, administered by DuPont, on October 18, 2001.[8]

DuPont's medical health department, where Faupel received her vaccination, has provided occupational health services to employees and a limited array of non-occupational medical services.[9] DuPont has offered flu vaccinations every year to employees who wish to receive the vaccination.[10] There were no incentives or requirements that employees receive the vaccination and the program was provided as a convenience to employees.[11]

DuPont informed employees about the vaccination program through flyers and bulk e-mail messages.[12] Faupel testified that there were posters announcing the vaccination program posted at eye level by the restrooms, in the photocopier room, in her department, by the elevators and going "in and out of the work area."[13] Some of the posters, she testified, encouraged people to get the flu shot "while supplies last."[14] One e-mail read,

---

### FLU SHOT SCHEDULE!!!!

Flu shots will be given at the Chestnut Run Medical Clinic located in Bldg. 700 on the following days and times:

Friday, October 26, 9:00am to 11:00 am, and 1:30pm to 3:00pm

Monday, October 29, 9:00am to 11:00am and 1:30pm to 3:00pm.

Future flu shot dates will be announced based on our supply of vaccine.[15]

---

Employees in Faupel's department were scheduled to get their vaccinations on October 24; however, Faupel testified that on October 18, Clava Queenan, the secretary from the DuPont medical department, offered her the opportunity to receive the

28, 2003) (hereinafter "IAB Hr'g Tr. at ——").

3. IAB Hr'g Tr. at 65.

4. *Id* at 67.

5. IAB Hr'g Tr. at 66.

6. *Id.*

7. *Id.* at 87.

8. *Barbara Faupel v. E.I. duPont De Nemours & Co.,* IAB Hearing No. 1222121 at 2 (March 28, 2003) (hereinafter "IAB Decision at ——").

9. IAB Decision at 9.

10. IAB Decision at 9.

11. *Id* at 10.

12. IAB Hr'g Tr. at 90.

13. *Id.* at 90.

14. IAB Hr'g Tr. at 69.

15. IAB Hr'g Tr. at Claimant's Exhibit 2 (approximate size of original).

vaccination early because Faupel was working with "upper management." [16]

Everett C. Sparks, R.N., a DuPont employee, administered the vaccination to Faupel during regular work hours in the DuPont building.[17] Sparks testified that a vaccination is a preventative measure, it can reduce absenteeism at work and in addition to being a preventative measure, he testified that employer provided vaccinations promote good employee relations.[18] Sparks stated that when an employee gets the flu, he or she could be out of work for up to two weeks.[19]

Faupel began to feel ill about a week after receiving the vaccination.[20] Faupel initially sought medical treatment from DuPont's medical health department but was eventually referred to her family doctor.[21] Faupel went to the hospital because of the continuing deterioration of her condition, which included numbness and partial paralysis in her lower extremities; eventually, Faupel suffered complete paralysis from the waist down.[22] After several months of rehabilitation, Faupel regained the use of her legs; however as of the date of the IAB hearing, she continued to have no feeling in her legs and used crutches or a motorized scooter to get around.[23] Faupel was diagnosed with Guillian–Barré Syndrome/chronic inflammatory demyelinating polyneuropathy ("CIDP").[24]

Faupel filed a petition with the IAB in November 2002 to determine compensation due alleging that her condition was the result of the vaccination she received at work. She sought compensation for ongoing total disability and payment of related medical expenses. DuPont disputed whether Faupel's CIDP resulted from the vaccine and whether it provided the vaccination within the course and scope of her employment.[25]

## III. STANDARD OF REVIEW

 The Supreme Court and this Court have repeatedly emphasized the limited appellate review of the factual findings of an administrative agency. The function of the reviewing Court is to determine whether the agency's decision is supported by substantial evidence.[26] Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[27] The appellate court does not weigh the evidence, determine questions of credibility, or make its own factual findings.[28] The reviewing Court must view the facts in a light most

---

16. IAB Hr'g Tr. at 70.

17. Appellee's Answering Brief at 3 (hereinafter "Appellee's Ans. Br. at ——").

18. IAB Hr'g Tr. at 109, 111, 116.

19. *Id.* at 110.

20. IAB Hr'g Tr. at 75.

21. *Id.*

22. IAB Hr'g Tr. at 76–77.

23. *Id.* at 80–81.

24. IAB Decision at 2.

25. DuPont disputed before the IAB, via expert testimony, that the injury was caused by the vaccination. The IAB, however, accepted the testimony of Faupel's expert to the contrary, and DuPont no longer presses this assertion on appeal.

26. *General Motors Corp. v. Freeman,* 164 A.2d 686, 688 (Del.1960); *Johnson v. Chrysler Corp.,* 213 A.2d 64, 66–67 (Del.Supr.Ct.1965).

27. *Oceanport Ind. v. Wilmington Stevedores,* 636 A.2d 892, 899 (Del.1994); *Battista v. Chrysler Corp.,* 517 A.2d 295, 297 (Del.Super.Ct.1986), *app. dism.,* 515 A.2d 397 (1986).

28. *Johnson,* 213 A.2d at 66.

favorable to the party prevailing below;[29] therefore, it merely determines if the evidence is legally adequate to support the agency's factual findings.[30] When factual determinations are at issue, the reviewing Court should defer to the experience and specialized competence of the Board.[31] If the decision is supported by substantial evidence, the Court must affirm the decision of an agency even if the Court might have, in the first instance, reached an opposite conclusion.[32]

## IV. DISCUSSION

### A. The IAB's Findings of Fact and Conclusions of Law.

The IAB correctly determined that in order for Faupel's injury to be compensable it must meet a two-pronged test. The injury must "arise out of" the employment and it also must be "in the course of" employment.[33] The IAB also concluded that an injury cause by a vaccination would be compensable beyond a situation where an employer compels or requires an employee to receive a vaccination. The IAB stated that "[w]hen the inoculation is not thus strongly tied to the employment . . ., it may still be covered if there is a combi-

nation of strong urging by the employer and some element of mutual benefit in the form of lessened absenteeism and improved employee relations."[34]

The IAB analyzed "in the course of employment" as referring to the time, place and circumstances of the injury.[35] The IAB held that "in order to be compensable, the injury must have been caused in a time and place where it would be reasonable for the employee to be under the circumstances."[36] The IAB found that an "employee does not have to be injured during a job-related activity to be eligible for workers' compensation benefits."[37] Activities noted by the IAB that had been found to be incidental to employment included "eating, drinking, smoking, seeking toilet facilities and fresh air, coolness or warmth."[38] The IAB found the vaccination was "in the course of employment" because "[i]t was administered during [Faupel's] normal work hours, her work place and by DuPont personnel."[39] The IAB held that even if the vaccination was extended to Faupel as a convenience, as argued by DuPont, the injury was still within the course of employment.[40]

**29.** *Chudnofsky v. Edwards*, 208 A.2d 516, 518 (Del.1965).

**30.** 29 *Del. C.* § 10142(d).

**31.** *Histed v. E.I. DuPont De Nemours & Co.*, 621 A.2d 340, 342(Del.1993); *James Julian, Inc. v. Testerman*, 740 A.2d 514, 519 (Del.Super.Ct.1999), *aff'd* 737 A.2d 530 (Del.1999).

**32.** *Brogan v. Value City Furniture*, 2002 WL 499721 at 2, 2002 Del.Super. LEXIS 88 at 6 (Del.Super.Ct.)

**33.** 19 *Del. C.* § 2304

**34.** IAB Decision at 14 (*quoting Larson's*, § 27.03[2] (2002)).

**35.** IAB Decision at 15 (*quoting Rose v. Cadillac Fairview Shopping Center Properties (De-*

*laware), Inc.*, 668 A.2d 782, 786 (Del.Super.Ct.1995)) (*citing Dravo Corp. v. Strosnider*, 45 A.2d 542 (Del.Super.1945)).

**36.** IAB Decision at 15 (*quoting Rose*, 668 A.2d at 786).

**37.** *Id.* (*quoting Tickles v. PNC Bank*, 703 A.2d 633, 637 (Del.1997)).

**38.** *Id.*

**39.** IAB Decision at 16.

**40.** IAB Decision at 16 (*quoting Tickles* 703 A.2d 633) (holding that employee was in course of employment when injured before normal work shift began, while engaged in an act of personal convenience and not while in the building in which she worked).

As to the critical issue of whether the injury "ar[ose]" out of Faupel's employment, the IAB utilized the test favored by Professor Larson, holding that an injury resulting from a vaccination "may still be covered if there is a combination of strong urging by the employer and some element of mutual benefit in the form of lessened absenteeism and improved employee relations.[41] The IAB held that "[t]he term 'arising out of employment' relates to the origin of the accident and its cause." [42] The IAB also found that "it is sufficient if the injury arises from a situation which is an incident or has a reasonable relation to the employment." [43] In order for the injury to arise out of employment, "there must be a reasonable causal connection between the injury and the employment." [44]

The IAB found that a "reasonable relation" existed between Faupel's employment and her receiving the vaccination.[45] The IAB held that "[w]hile DuPont characterizes the flu shot program as a public health initiative, the evidence suggests otherwise. This program was not offered to the general public but it was a program only offered to employees. The IAB gave weight to the fact that the vaccination program was "a DuPont funded program administered by DuPont personnel at DuPont facilities to DuPont employees ... [and] not a case where an employer merely made some space available for an independent agency ..., to give flu shots to the public." [46]

The IAB found that DuPont had sufficiently encouraged employees to receive the vaccination such that it rose to the level of "strong urging." [47] The IAB held that the "frequency of the reminders constitutes urging" and it found that the placement of the flyers in locations where they would be frequently seen and the fact that e-mails were sent directly to employees further constituted strong urging on the part of DuPont.[48]

The IAB relied in part on the leading case of *Saintsing v. Steinbach* when analyzing the "strong urging" test. In *Saintsing,* the employer provided smallpox vaccinations to its employees in response to a specific smallpox scare, one of whom suffered an injury from the vaccination; the employer had distributed a notice to its employees stating that it would provide free inoculation and "strongly urge[d]" employees to take advantage of the service.[49] The New Jersey appeals court held "[t]he employees, although not compelled, were strongly urged to submit to the vaccination and, in natural response, most of them did." [50]

The IAB agreed with the holding in *Saintsing* that a vaccination provides a mutual benefit to the employer and employee.[51] The *Saintsing* Court held that "[i]t would be unrealistic to find that [the company's efforts] were for the exclusive

41. *Larson's,* § 27.03[2] (2002).

42. IAB Decision at 16 (*quoting Rose,* 668 A.2d at 786).

43. *Id (quoting Dravo,* 45 A.2d at 544).

44. IAB Decision at 16 (*quoting Rose,* 668 A.2d at 786).

45. IAB Decision at 16.

46. *Id.*

47. IAB Decision at 16.

48. *Id* at 17.

49. *Saintsing v. Steinbach Co.,* 1 N.J.Super. 259, 64 A.2d 99, 99 (App.Div.1949).

50. *Id* at 101.

51. *Saintsing,* 64 A.2d at 101.

benefit of the employees and were not additionally designed to further a sound employer-employee relationship and safeguard the employer against the serious effects of a case of smallpox amongst its employees." [52] The IAB found there were "intangible benefits of good employer-employee relations" that accrued from DuPont providing the vaccination.[53] The IAB held that DuPont "clearly has a practical interest in avoiding absenteeism" and that providing the vaccination could diminish the spread of illness among employees.[54] The IAB concluded that the injury was compensable.

## B. Contentions of the Parties.

1. *DuPont Contends that the IAB Erred, As a Matter of Law, When It Concluded That Faupel's Illness Occurred During The Course And Scope of Her Employment And Arose From Her Employment.*

DuPont argues that the IAB erred when it determined that DuPont had "strongly urged" Faupel to receive the vaccination. DuPont makes the argument that if any "strong urging" was made, then it was the federal government that promoted the vaccination and publicized the program.[55] DuPont contends that because the vaccination program was voluntary there was no "strong urging" on its part. DuPont also argues that because there were "no adverse repercussions from a decision by a particular employee not to have the vaccination" the program cannot be viewed as

having been "strongly urged" by DuPont.[56] DuPont asks the rhetorical question, "Does Faupel and the [Industrial] Accident Board suggest that DuPont should, as a convenience, agree to conduct the program for the federal government, but then not tell any of the employees about the program?" [57]

DuPont further argues that the IAB erred in finding that there was a "mutual benefit" to Faupel and itself. DuPont asserts that the IAB has "ignored the 'real world' and established a legal principle based upon no logic and no common sense at all." [58] DuPont's argument is that the only benefit to DuPont was that "it would prefer to have a healthy employee than an ill employee ... [thereby making] every action taken by an employer an event that would fall within the purview of the worker[s] compensation law." [59] DuPont claims that it did not benefit from the vaccination program and that it was not offered to employees for DuPont's benefit.[60]

2. *Faupel Contends that the IAB Did Not Err, as a Matter of Law, when It Concluded that Faupel's Injury Occurred during the Course and Scope of Her Employment and Arose from Her Employment.*

Faupel contends that the IAB correctly relied on *Saintsing* to find that DuPont "strongly urged" employees to get vaccinated.[61] Faupel asserts that the *Saintsing* Court found that "the posted notice [only]

---

52. *Id.*

53. IAB Decision at 17.

54. *Id.*

55. IAB Decision at 17.

56. Appellant's Op. Br. at 30.

57. Appellant's Reply Br. at 8.

58. *Id.*

59. Appellant's Reply Br. at 8.

60. Appellant's Op. Br. at 32.

61. Faupel does not appear to agree with the applicability of the Larson test's "strong urging" as opposed to "urging" by an employer.

constituted a suggestion, an invitation and urge, calculated to induce an employee to submit to the treatment who might not otherwise have done so." [62] The *Saintsing* court, Faupel argues, found that it "could find no difference between the action of the employee in availing himself of the inoculation facility and that of one using any other convenience furnished by the plant for the workmen." [63]

Faupel argues that the IAB was correct in finding that the vaccination was of mutual benefit to Faupel and DuPont. Faupel contends that the IAB was correct in following *Saintsing's* holding that

"the vaccination service furnished at the employer's premises was a mutually beneficial facility comparable to its medical clinic, cafeteria and other employee facilities incidental to the employment, and that insofar as it aided in the prevention of smallpox within the employee group, it protected the employer against possibly disastrous business consequences." [64]

Faupel asserts that DuPont's own witness "admitted that the twofold purpose of administering the flu shot was to prevent absenteeism among DuPont employees and to promote good employer/employee relations." [65]

## C. The IAB did not Err as a Matter of Law and Its Decision is Supported by Substantial Evidence.

■■■ The IAB found for Faupel and awarded her workers' compensation because it found that she met the two-pronged test of 19 *Del. C.* § 2304 and enunciated Delaware case law; [66] in addition to adopting the "strong urging" and mutual benefit" analysis from *Larson* and *Saintsing.* The test requires a compensable injury to arise out of and be in the course of employment. The *Larson/Saintsing* analysis states that "[w]hen the inoculation is not thus strongly tied to the employment ... it may still be covered if there is a combination of strong urging by the employer and some element of mutual benefit in the form of lessened absenteeism and improved employee relations." [67] This Court finds the two-part "in the course of and arising out of employment" test and *Larson/Saintsing* analysis to be the correct statement of the scrutiny to be utilized when there is an issue of whether a vaccination, resulting in injury, arose out of and was in the course of employment.

While there are not many cases that have addressed the compensability of employer provided vaccination, two cases not cited by the IAB or either party are infor-

---

**62.** Appellee's Ans. Br. at 8 (*quoting Saintsing,* 64 A.2d at 99).

**63.** *Id.* (*quoting Saintsing,* 64 A.2d at 99).

**64.** Appellee's Ans. Br. at 8 (*quoting Saintsing,* 64 A.2d at 99).

**65.** Appellee's Ans. Br. at 10.

**66.** *See Children's Bureau v. Nissen,* 29 A.2d 603 (Del.Super.Ct.1942) (holding the requirements, "in the course of" and "arise out of" employment must conjoin; the former relates to the time, place and circumstances of the accident; the latter to its origin and cause);

*Dravo Corp. v. Strosnider,* 45 A.2d 542 (Del.Super.Ct.1945) (holding all cases construing Workers' Compensation statutes similar to Delaware's agree that the two terms "arising out of" and "in the course of" employment are not synonymous, but distinct, and both must be shown to exist in a given case); *Rose v. Cadillac Fairview Shopping Center, et al.,* 668 A.2d 782 (Del.Super.Ct.1995) (holding that the requirements of "arising out of" and "in the course of" employment are two separate requirements both of which must be met).

**67.** IAB Decision at 14 (*quoting Larson's* § 27.03[2] (2002)).

mative. In *Monette v. Manatee Memorial Hospital*, a housekeeper suffered a severe reaction to a flu vaccination given by her employer, a hospital.[68] The hospital had sent a notice to all departments announcing the availability of free flu vaccinations and it was undisputed that the offer of the vaccination was voluntary.[69] The health services manager testified at the worker's compensation hearing that "participation in the program by high risk employees could benefit the hospital, since absenteeism could be an issue, but [the health care manager] vehemently denied that the purpose of the flu vaccination program was to reduce employee absenteeism."[70] The employer asserted that the reason for offering the vaccination was because of a recommendation from the Advisory Council for Immunization Practices.[71]

The appeals court found that the vaccination "flow[ed] as a natural consequence of the employment because the employee recognized, as an employee in a hospital setting, her responsibility to protect patients from exposure to flu."[72] The court held that "[b]y availing herself of the offered flu shot, claimant's effort to avoid illness that would impair her work performance is incidental to her employment."[73] The court also found that [i]t seems clear that an employer derives a benefit from maintaining the health of employees."[74]

In *Lampkin v. Harzfeld's*, the employee was a salesperson in the employer's store.[75] The employer had apparently " 'advised [the employee] that it would be necessary for her to take a series of flu shots' to be administered by a doctor who was an agent and employee of [Harzfeld's]." [76] The vaccination was administered on the employer's premises; however, the employee paid $1.50 for the vaccination and thought the employer paid a percentage.[77]

The Court held that the injury arose out of the employment because the employee was "administered the influenza inoculation by an agent of her employer on her employer's premises during regular work and normal work hours."[78] The Court found that the injury

"arose 'in the course of' employment because it occurred within the period of employment at a place where she was directed to be, and while she was engaged in doing something (receiving the inoculation from an agent of her employer) incidental to her employment, that is, taking steps for the mutual benefit of herself and her employer to prevent absences from work."[79]

The Court found that receiving the inoculation was not a condition of employment, even though the employee testified that she "took [the vaccination] the previous year, and [she]couldn't afford to get dis-

68. *Monette v. Manatee Memorial Hospital*, 579 So.2d 195, 195 (Fla.Dist.Ct.App.1991).

69. *Id* at 196.

70. *Monette*, 579 So.2d at 196

71. *Id.* (It is unclear from the case if this was a federal or state agency).

72. *Monette*, 579 So.2d at 197.

73. *Id.*

74. *Monette*, 579 So.2d at 197.

75. *Lampkin v. Harzfeld's*, 407 S.W.2d 894, 895 (Mo.1966).

76. *Lampkin*, 407 S.W.2d at 895–896.

77. *Id* at 896.

78. *Lampkin*, 407 S.W.2d at 897.

79. *Id.*

charged for not taking the 'flu shot'." [80] The Court found that the employer "encouraged, advised and instructed her to take the inoculation, and the purpose of the inoculation was to prevent [the employee] from getting influenza and losing time from work." [81] The Court held that the fact that the employee paid for part of the cost did not change the circumstances of the case and the vaccination was still within the course of and arising out of employment. [82] The Court assumed that receiving the inoculation was "not a condition of employment." [83] The *Lampkin* Court cited numerous cases and authorities in support of its holding, and collectively commented on those cases and authorities that they were all "to the effect that where there is a combination of strong urging by the employer and mutual benefit, then the injury resulting from inoculation arises out of and in the course of employment." [84]

 In the instant case, the IAB had sufficient evidence to find that the vaccination was in the course of employment. In the course of employment is a matter of the time, place and circumstances of the injury. [85] The "time and place" requirement has been held to mean the "injury must have been caused in a time and place where it would be reasonable for the employee to be under the circumstances." [86] Faupel was an employee of DuPont when she received the vaccination. Faupel received the vaccination on DuPont's premises during normal working hours; further, there was no evidence that Faupel received the vaccination during a lunch break or other scheduled break time. A compensable injury, however, does not have to take place during job-related activity and may be incidental to employment; therefore even if an employee is injured during an activity that results from a facility or act of the employer provided for the convenience of the employee, the injury may be compensable. [87] DuPont admitted that the vaccination program was for the employees' convenience. [88]

 Substantial evidence existed to allow the IAB to determine that the vaccination arose out of Faupel's employment. The term " 'arising out of employment' relates to the origin of the accident and its cause" and "there must be a reasonable causal connection between the injury and

80. *Lampkin,* 407 S.W.2d at 897.

81. *Id.*

82. *Lampkin,* 407 S.W.2d at 898.

83. *Id* at 897.

84. *Lampkin,* 407 S.W.2d at 897.

85. *Rose,* 668 A.2d 782; *Dravo,* 45 A.2d 542; *Children's Bureau,* 29 A.2d 603.

86. *Rose,* 668 A.2d at 786.

87. *Tickles,* 703 A.2d at 635, 637.

88. Appellant's Op. Br. at 32. DuPont asks, "Imagine an employer who gives an employee an aspirin because the employee forgot to bring some to work. If that employee has an adverse reaction to the aspirin, should the employer be responsible for worker[s] compensation benefits merely because it would rather have the employee feel better?" (Appellant's Reply Br. at 9). Actually, this situation has occurred and at least two courts have found that when an employer provides pain medication to an employee and that employee suffers an adverse reaction, the worker is eligible for workers' compensation. *See Jensen v. City of Pocatello et al.,* 135 Idaho 406, 18 P.3d 211 (2000) (holding that employee who was given pain relievers by his employer for a headache was entitled to worker's compensation when he suffered renal failure as a result of the drug); *Payne v. Galen Hospital Corp.,* 28 S.W.3d 15 (Tex.2000) (holding that employee's adverse reaction to pain reliever given to her by employer was subject to the Workers' Compensation Act).

the employment."[89] It was uncontested that the vaccination was funded by DuPont, administered by DuPont employees and given at DuPont facilities. There was no evidence presented by DuPont that the vaccination program was open to the public; instead, the vaccine program was part of a non-occupational health service that DuPont has historically provided to employees only.[90]

The *Saintsing* Court found that one notice posted by the employer "strongly urging" employees to receive the smallpox vaccination was sufficient to have swayed employees to get the vaccination.[91] Faupel testified at the IAB hearing that DuPont sent bulk e-mails to each employee about the vaccination program, placed numerous flyers in conspicuous places to remind employees about the vaccination program and sent reminders from different departments.[92] DuPont argues that because the flyers, e-mails and reminders were basically neutral and did not "strongly urge" employees to get the vaccination, they did not rise to a sufficient level to be considered "strongly urging" employees under the *Larson* and *Saintsing* standard. However, *Saintsing* was a case of the quality of the urging, i.e. the "strongly urging" wording in one notice. In the instant case the IAB correctly looked at the quantity of the notices as being determinative.[93]

Based on the record, and the Board's own expertise, the IAB had sufficient evidence to find that the vaccination provided a mutual benefit to DuPont and Faupel.[94] The court in *Saintsing* held that it would be "unrealistic to find that [the vaccinations] were for the exclusive benefit of the employees.[95] Other courts and authorities that have analyzed the question of whether a vaccination is compensable under workers' compensation have held that the when an employer provides a vaccination to employees there is a benefit to the employer.[96]

The IAB found that there were "intangible benefits of good employer-employee relations ... [as well as the] practical interest in avoiding absenteeism."[97] DuPont argues that '[i]n making the argument [that a mutual benefit exists], ... Faupel and the [Industrial] Accident Board have ignored the "real world" and established a legal principle based upon no logic and no common sense at all."[98] However, it is common knowledge that

89. *Rose*, 668 A.2d at 786.

90. IAB Hr'g Tr. at 99.

91. *Saintsing*, 64 A.2d 99.

92. IAB Hr'g Tr. at 68–69.

93. IAB Decision at 16–17.

94. The Supreme Court and this Court have held that in reviewing factual determinations of the IAB "[a court] must take due account of the experience and specialized competence of the Board and the purpose of our workers' compensation law." *Histed*, 621 A.2d at 342; *Julian*, 740 A.2d at 519.

95. *Saintsing*, 64 A.2d at 101.

96. *See Smith v. Brown Paper Mill Co.*, 152 So. 700 (La.Ct.App.1934) (holding that the nurse who administered the vaccination "was not employed from altruistic motives or for the benefit of mankind in general, but because ... the service rendered ... were a direct benefit to her employer"); *Lampkin v. Harzfeld's*, 407 S.W.2d 894, 895 (Mo., Division Two 1966) (holding the purpose of the inoculation was to prevent the employee from getting influenza and losing time from work); *Monette v. Manatee Memorial Hospital*, 579 So.2d 195, 195 (Fla.Dist.Ct.App.1991) (holding "it seems clear that an employer derives a benefit from maintaining the health of employees").

97. IAB Decision at 17.

98. Appellant's Reply Br. at 8.

employee absenteeism from the common cold and the flu is expensive to businesses.[99] DuPont also suggests that, in this "post-September 11 world," that if the federal government were to "request the aid of a large employer such as DuPont for the inoculation of employees against a biological agent", that any holding of this Court that the injury was compensable would have a "sad and chilling effect."[100] However, this Court will not speculate about the applicability of the Workers' Compensation Act to factual scenarios not before the Court.

The IAB, using common sense and its own specialized competence and experience, found that a vaccination, as a preventative measure, had a benefit to the employer. This Court finds that there was sufficient evidence for the IAB to have made this conclusion.

## CONCLUSION

For all of the above reasons, the Court finds that substantial evidence supports the Board's decision. The Board otherwise committed no error of law. The decision of the Board is **AFFIRMED.**

**IT IS SO ORDERED.**

---

99. *See, e.g., The Yearbook of Experts, Authorities and Spokespersons* ®, "Cold and Flu Season: Bad for Business?" (Broadcast Interview Source, Inc. 2004) (stating that the cold and flu season costs U.S. businesses an estimated $69 billion in lost productivity every year).

100. Appellant's Op. Br. At 33–34.